E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
RICHARD M. PARK
Assistant United States Attorney
Chief, Civil Rights Section
MATTHEW J. BARRAGAN (Cal. Bar No. 283883)
MARGARET M. CHEN (Cal. Bar No. 288294)
Assistant United States Attorneys
    Federal Building, Suite 7516
    300 North Los Angeles Street
    Los Angeles, California 90012
    Telephone: (213) 894-2444 (Barragan)/-3148 (Chen)
    Facsimile: (213) 894-7819
    E-mail: Matthew.Barragan@usdoj.gov
           Margaret.Chen@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>AQUA 388 COMMUNITY ASSOCIATION, FIRSTSERVICE RESIDENTIAL CALIFORNIA, LLC, REBECCA HAWKINS, CHRISTOPHER HARRINGTON, and AQUA MAINTENANCE CORPORATION,<br><br>    Defendants. | No. CV 23-2498<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

The United States of America ("United States") alleges as follows:

## NATURE OF THE ACTION

1. The United States brings this action to enforce Title VIII of the Civil Rights Act of 1968 (the "Fair Housing Act"), as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601-3631.

2. This action for injunctive relief and monetary damages is brought under 42 U.S.C. § 3612(o) on behalf of Dr. Emma Adams, who has paraplegia.

3. The United States alleges that, by refusing to provide Dr. Adams with an assigned, van-accessible parking space for over three years, Defendants discriminated in the terms, conditions, or privileges of sale of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of Dr. Adams' disability[1] by refusing to make a reasonable accommodation in rules, policies, practices, or services, when such accommodation was necessary to afford her equal opportunity to use and enjoy a dwelling, in violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(2) and § 3604(f)(3)(B).

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 3612(o).

5. Venue is proper in the Central District of California under 42 U.S.C. § 1391(b) and 42 U.S.C. § 3612(o) because the events giving rise to the United States' claims occurred in this judicial district, and they concern or otherwise relate to real property located in this judicial district.

## PARTIES

6. Plaintiff is the United States of America.

7. Defendant Aqua 388 Community Association ("Aqua 388"), at all times

---

[1] The Fair Housing Act uses the term "handicap," see 42 U.S.C. § 3602(h), but consistent with modern usage, the government uses the term "disability" in this Complaint, and such usage is intended to cover the term "handicap" as used in the Act.

relevant to this Complaint, managed the common spaces of the Subject Property located at 388 East Ocean Boulevard in Long Beach, California ("Subject Property"). The Subject Property is one of two neighboring high-rise condominium towers that together are called the Aqua Towers. The Subject Property consists of 556 condominium units. Aqua 388 is governed by the Aqua 388 Board of Directors.

8. Defendant Aqua Maintenance Corporation, at all times relevant to this Complaint, managed the shared parking garage of the Subject Property.

9. Defendant FirstService Residential California, LLC ("First Service"), at all times relevant to this Complaint, was retained by Aqua 388 to manage the Subject Property. FirstService is a Limited Liability Company organized under the laws of California.

10. Defendant Christopher Harrington ("Mr. Harrington"), at all times relevant to this Complaint, was the General Manager at the Subject Property and employed by FirstService.

11. Defendant Rebecca Hawkins ("Ms. Hawkins"), at all times relevant to this Complaint, was the Management Agent at the Subject Property and employed by FirstService.

**FACTS**

12. The Subject Property is a dwelling within the meaning of 42 U.S.C. § 3602(b), and does not qualify for any exemptions under the Fair Housing Act.

13. The Subject Property offers 888 parking spaces for 556 units, located on three underground parking levels that are divided into areas with separate entrances. Parking spaces are assigned as exclusive easements to condominium owners upon purchase of a unit. The 888 spaces consist of: 693 standard parking spaces deeded to individual resident households, 120 spaces located in a separately managed fee for entry public parking lot that does not lead directly to the Subject Property, 56 visitor/guest parking spaces, and 19 parking spaces designated for persons with disabilities ("accessible parking spaces").

14. The Subject Property's 19 accessible parking spaces are marked with blue painted parking lines and a "universal access" symbol. These spaces are available to residents on a first-come, first-served basis. Only four are these spaces are wide enough to be accessible for vans modified for wheelchairs ("van-accessible parking spaces").

15. Dr. Adams is a person with a disability within the meaning of the Fair Housing Act. She has paraplegia. Her disability makes her unable to walk, and she uses a motorized wheelchair. Dr. Adams' physical disability is readily apparent.

16. In December 2016, Dr. Adams purchased her condominium in the Subject Property. Since February 20, 2017, Dr. Adams has been residing at the Subject Property.

17. Dr. Adams drives a modified accessible van that she can enter and exit only via a ramp that extends from the passenger side of the vehicle. The van requires an eight-foot clearance on the passenger side to allow the ramp to extend. If a car is parked on the passenger side of Dr. Adams' van, leaving less than eight feet of clearance, the ramp cannot be deployed, and she cannot enter or exit her vehicle.

18. The Uniform Federal Accessibility Standards ("UFAS") provide that an accessible parking space for a van designed for a person with a disability should have an adjacent access aisle at least 96 inches wide, which is equivalent to eight feet of clearance.

19. When Dr. Adams purchased her unit, she was deeded parking space W-120. Dr. Adams' deeded parking space is not a designated accessible parking space and does not have eight feet of clearance on either side of it. Because Dr. Adams must use a wheelchair due to her disability, the parking space provided to her was not usable.

20. On January 3, 2017, prior to moving in, at an in-person meeting with Ms. Hawkins at the Aqua 388 office, Dr. Adams made her **first reasonable accommodation request** for a van-accessible parking space. Dr. Adams explained to Ms. Hawkins that she drives a modified vehicle with a ramp. She explained that her deeded parking space was located between two other spaces and would not be usable to her if a car parked next to her space on the passenger side of her vehicle. Dr. Adams asked Ms. Hawkins to

introduce her to neighbors with parking spaces located at the end of a parking lane or next to an access aisle, so that she could make informal arrangements to switch the usage of her deeded parking space with that of such a neighbor. Dr. Adams stated that she observed several deeded parking spaces located at the end of parking lanes and some other deeded spaces that were identical to the specially-marked van-accessible parking spaces that would work for her.

21. At this meeting, Ms. Hawkins told Dr. Adams, "I don't think I can do that but I will wait for [Mr. Harrington] and let him know." Neither Mr. Harrington nor Ms. Hawkins got in touch with Dr. Adams after this meeting.

22. On January 21, 2017, Dr. Adams made her **second reasonable accommodation request** for accessible parking to Ms. Hawkins. Dr. Adams emailed Ms. Hawkins, asking, "[i]s there any way I can secure a handicap spot on any floor?"

23. On the same date, Ms. Hawkins emailed Dr. Adams in response, stating "[s]ince each parking space is already owned by a unit owner, there would not be an open space available for a handicap parking space."

24. Two hours later, on January 21, 2017, Dr. Adams made her **third reasonable accommodation request** for accessible parking to Ms. Hawkins. She submitted an "Architectural Modification" request form provided to her by Ms. Hawkins, on which she requested, "[h]aving permanent access to a handicap parking spot with enough space for accessible van (access aisle 96" wide)."

25. On January 24, 2017, Ms. Hawkins forwarded Dr. Adams' email to Mr. Harrington. Mr. Harrington sent Dr. Adams an email copying Ms. Hawkins and Daniel Verona ("Mr. Verona"), FirstService Residential California, LLC's Assistant General Manager, denying Dr. Adams' reasonable accommodation requests. His email stated in pertinent part that "the Association does not assign handicap parking spaces to individual owners. All handicap spaces are on a first come, first serve basis. If you are having issues with finding parking on your parking level, we may be able to program your gate remote so that it functions on all 3 garage levels."

26. On or around February 15, 2017, Dr. Adams made her **fourth reasonable accommodation request** for permanent accessible parking to Defendants during an in-person meeting with Mr. Harrington and Mr. Verona. During the meeting, Dr. Adams explained that she drives a modified vehicle that is equipped with a ramp and that her deeded parking space is in between two other spaces, rendering it unusable to her if a vehicle was parked next to it on the passenger side of her space.

27. At the meeting, Mr. Harrington again denied Dr. Adams' reasonable accommodation request by informing her that the parking spaces are deeded to units and that Aqua 388 could not give her another parking space. Mr. Harrington gave Dr. Adams access to all three garage levels so she could look for an available usable parking space.

28. On or around February 20, 2017, Dr. Adams moved into her unit. Beginning on that date, Dr. Adams was often forced to drive around all three parking garage levels, sometimes for hours, circling and waiting in her car, looking for any parking space with sufficient clearance on the passenger side for her ramp. Some nights she had to eat dinner in her car while waiting for a parking space with sufficient clearance for her ramp to become available. The three parking garage levels are not connected, so Dr. Adams has had to exit the garage entirely and drive on the public street to enter a different garage level, which can be stressful and time-consuming in downtown Long Beach.

29. On or around May 25, 2017, Dr. Adams made her **fifth reasonable accommodation request** for accessible parking during an Aqua 388 Board meeting. At the meeting, Dr. Adams gave each Aqua 388 Board Member a folder containing a letter she wrote dated May 25, 2017, related exhibits, and a copy of her business card. The May 25, 2017 letter states in pertinent part, "[p]lease let this memorandum serves [sic] as a formal request for reasonable accommodation for accessible parking space…Due to the fact that I have permanent disability (paraplegic) that required the use of power wheelchair and driving a modified accessible van with 8ft clearance parking space

requirement on the passenger side.  I have made numerous (in person and in emails) requests for reasonable accommodations for parking spot[...].”  Dr. Adams read her letter aloud to the Aqua 388 Board Members during the meeting.  The Aqua 388 Board Members did not respond to her request at the meeting.

30. On May 31, 2017, Defendants' attorney sent Dr. Adams a letter in response to her May 25, 2017, letter, denying her reasonable accommodation request for accessible parking.  Among other things, the denial stated: "[T]here does not appear to be any nexus between the accommodation you have requested and your disability.  While clearly your mobility is impaired, you use a power wheelchair, so proximity is not an issue."  The denial also stated: "You are asking the Board to prioritize your disability above the disability of other residents because of your work schedule, which is simply not reasonable.  The Association is obligated to treat all residents with handicap parking placards the same.  While the Association informs us that it regularly verifies that vehicles parked in handicapped parking display valid handicap placards, the Association is not permitted under the FHA to question or make judgments upon a resident's need for a handicap parking placard or to single out some residents as deserving preferred access to handicap parking spaces.  Accordingly, the Association cannot assign you your own handicap parking space."

31. On March 2, 2018, in response to complaints from residents, including Dr. Adams, about misuse and lack of availability of accessible parking spaces in the Subject Property's garage, the Aqua Maintenance Corporation instituted new rules stating, in pertinent part, that: "1) no vehicle may be parked in [a] disabled person parking space without displaying a valid state-issued disabled parking placard; 2) Vehicles displaying a Valid Placard may be parked in the same disabled parking space in the Residential Garage for up to three (3) consecutive days, after which time such vehicle must be moved to another disabled parking space or elsewhere; and 3) A resident may not park more vehicles in the garage at the same time than the actual number of parking spaces deeded to the unit."

32. On March 23, 2018, Dr. Adams filed a complaint with the United States Department of Housing and Urban Development ("HUD").

33. On or around May 16, 2018, May 21, 2018, and June 24, 2018, Defendants issued Dr. Adams parking citations for parking her vehicle in space 153, a van-accessible parking space, for more than three days without moving it.

34. On June 27, 2018, Dr. Adams made her **sixth reasonable accommodation request** for a van-accessible parking space in an email response to Mr. Harrington. She wrote: "[h]ere is one more request for parking accommodation; I'm requesting any permanent accessible parking spot that has minimum of 8ft clearance until the pending investigation/litigation is completed."

35. On June 28, 2018, Mr. Harrington replied via email that he would place Dr. Adams' request on the next meeting agenda for Aqua Maintenance Corporation. However, Dr. Adams did not receive communication from Defendants related to her request. She continued to park her van in any available van-accessible parking space she could find.

36. On January 27, 2019, Defendants issued Dr. Adams a fourth parking citation for parking her vehicle in space 153, a van-accessible parking space, for more than three days without moving it. The parking citations caused Dr. Adams additional stress and frustration.

37. On May 19, 2019, Defendants issued Dr. Adams a fifth parking citation for parking her vehicle in space 153, a van-accessible parking space. The citation stated, "PARKED 2 DAYS. WILL BE TOWED ON THE 3RD DAY." The citation was later retracted.

38. Section 2.9.5 of Defendants' Covenants, Conditions, Restrictions and Reservation of Easements ("CC&Rs") "Unassigned Parking" indicates, in relevant part, that residents have a right to re-assign, exchange or transfer unassigned parking spaces.

39. The CC&Rs also provide that "…unassigned parking spaces in the Residential Garage will be conveyed in fee to the Master Association to be held as a pool

of unassigned parking, subject to the requirements of this Master Declaration and Coastal Commission Deed Restrictions, and further subject to the Master Association's right to re-assign, exchange and transfer unassigned parking spaces with Owners at its sole discretion. It states that nothing prohibits residents from:

> … either temporarily or permanently exchanging or transferring their Pre-Assigned Parking Spaces, Additional Exclusive Parking Spaces or Exclusive Use Garages with other Owners in the Community (or the Master Association) provided that the affected Owners give the Master Association prior written notice of the proposed exchange or transfer (including the names of the affected Owners, their Unit Numbers, and the assigned numbers of the exclusive easement areas that will be exchanged or transferred), and provided further that the Master Association must confirm in writing delivered to each affected Owner that the exchange or transfer will not cause either Owner to violate the exclusive parking space maximums imposed on the Community by the Coastal Commission Restrictions and this Master Declaration and summarized in Section 2.8.5 below […].

40. At no time did Defendants discuss these provisions in the CC&Rs with Dr. Adams or otherwise explain the rules or requirements about switching parking spaces among residents, despite Dr. Adams' requests to switch spaces.

41. On or about February 13, 2020, more than three years after Dr. Adams' first reasonable accommodation for a van-accessible parking space, Defendants installed a sign on van-accessible parking space 153, stating "Space 153 is RESERVED – Unauthorized vehicles will be towed." But Defendants did not remove the universal accessible parking symbols from the wall in front of the parking space or the ground inside the parking space, leaving the possible impression that the space was reserved on a first-come, first-serve basis for anyone who required accessible parking and not specifically for Dr. Adams.

42. On or about February 13, 2020, Dr. Adams began using space 153, even though the universal accessible symbols remained. On at least two occasions since space 153 was marked "reserved," other vehicles have parked in space 153. Each time Dr. Adams leaves the Subject Property, she fears that she will find another vehicle parked in

space 153, which would cause her to have to drive around for an unknown amount of time until another parking space with sufficient clearance for her ramp became available.

### HUD ADMINISTRATIVE PROCESS

43. On March 23, 2018, Dr. Adams timely filed a complaint with HUD.

44. Pursuant to 42 U.S.C. § 3610(a) and (b), the Secretary of HUD conducted and completed an investigation of the complaint, attempted conciliation without success, and prepared a final investigative report. Based upon the information gathered in the investigation, the Secretary, pursuant to 42 U.S.C. § 3610(g)(1), determined that reasonable cause existed to believe that illegal discriminatory housing practices had occurred.

45. On September 27, 2022, the Secretary issued a Charge of Discrimination, pursuant to 42 U.S.C. § 3610(g)(2)(A), charging the above-named Defendants with engaging in unlawful discrimination in violation of the Fair Housing Act.

46. On October 4, 2022, Defendants elected to have the claims asserted in the HUD Charge resolved in a civil action pursuant to 42 U.S.C. § 3612(a).

47. On October 5, 2022, an Administrative Law Judge issued a Notice of Election to Proceed in United States Federal District Court and terminated the administrative proceeding on Dr. Adams' complaint.

48. Following this Notice of Election, on October 11, 2022, the Secretary of HUD authorized the Attorney General to commence this civil action pursuant to 42 U.S.C. § 3612(o).

### CAUSE OF ACTION
### (Fair Housing Act Violations)

49. The United States realleges and incorporates by reference herein the allegations contained in Paragraphs 1 through 48 as if set forth here in full.

50. By the conduct described in the foregoing paragraphs, Defendants have:

   a. Discriminated against Dr. Emma Adams in the terms, conditions, or privileges of sale or the rental of a dwelling, or in the provision of services or

1 facilities in connection with such dwelling, because of disability, in violation of 42 U.S.C. § 3604(f)(2)(A); and

    b.    Refused to make reasonable accommodations in rules, policies, practices, or services, when such accommodations were necessary to afford Dr. Emma Adams an equal opportunity to use and enjoy her dwelling, in violation of 42 U.S.C. § 3604(f)(3)(B).

51.    As a result of Defendants' discriminatory conduct, Dr. Adams is an "aggrieved person" as defined in 42 U.S.C. § 3602(i) and has suffered damages, including but not limited to physical pain and suffering, out-of-pocket expenses, and emotional distress.

52.    The discriminatory actions of the Defendants were intentional, willful, and taken in disregard of Dr. Adams' federally protected rights.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court enter an ORDER that:

1.    Declares that Defendants' conduct as set forth above violates the Fair Housing Act;

2.    Enjoins Defendants, their agents, employees, successors, and all others in active concert or participation with any of them, from discriminating against any person because of disability in any aspect of the sale, rental, use, or enjoyment of a dwelling;

3.    Orders Defendants to take such affirmative steps as may be necessary to restore, as nearly as practicable, Dr. Emma Adams to the position she would have been in but for the discriminatory conduct;

4.    Orders Defendants to take such actions as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of their unlawful conduct, including implementing policies and procedures to ensure that no applicants or residents are discriminated against because of disability; and

5.    Awards monetary damages to Dr. Emma Adams as authorized by 42 U.S.C.

§§ 3612(o)(3) and 3613(c)(1).

The United States further prays for such additional relief as the interests of justice may require.

## DEMAND FOR JURY TRIAL

The United States demands a trial by jury.

Dated: April 3, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
RICHARD M. PARK
Assistant United States Attorney
Chief, Civil Rights Section

   */s/ Matthew J. Barragan*
MATTHEW J. BARRAGAN
MARGARET M. CHEN
Assistant United States Attorneys

Attorneys for Plaintiff
United States of America