UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

EMMA ADAMS,

      Plaintiff,

v.

AQUA 388 COMMUNITY
ASSOCIATION et al.,

      Defendants.

Case No. 2:23-cv-02498-SB-JPR

ORDER AMENDING AND
EXPLAINING THE COURT'S
DECEMBER 5, 2024 SUMMARY
ORDER ON POST-TRIAL
MOTIONS [DKT. NO. 293]

Defendants denied Plaintiff-Intervenor Emma Adams the use of a parking spot for her wheelchair accessible van in violation of the Fair Housing Act (FHA). At trial in July 2024, the jury found Defendant Christopher Harrington not liable for damages and awarded Adams $9,250,000 against the three corporate defendants: $4,000,000 in compensatory damages; and $5,250,000 in punitive damages—$500,000 against Defendant Aqua 388 Community Association, $250,000 against Defendant Aqua Maintenance Corporation, and $4,500,000 against Defendant FirstService Residential California, LLC (FSR). FSR moved for judgment as a matter of law under Federal Rule of Civil Procedure 50 on the punitive damages award; the two Aqua Defendants moved for a mistrial and a new trial under Federal Rule of Civil Procedure 59.[1] The Court issued a tentative ruling and held a hearing on the motions on August 9, set the matter for a new trial, and took the motions under submission. On December 5, 2024, to enable the parties to prepare for the retrial, the Court issued a two-page order summarily ruling on the motions, to be followed by a further explanation. Dkt. No. 293.

---

[1] Separately, the Court issued an order to show cause (OSC) why Adams's former counsel Brian Olney should not be sanctioned for engaging in improper argument during his rebuttal closing argument.

1

The Court now provides that explanation, together with a correction to the December 5 order.  Finding that Adams's rebuttal closing argument constituted misconduct that affected the integrity of the verdict, the Court grants the motion for new trial on compensatory and punitive damages against the Aqua Defendants and compensatory damages against FSR.  The Court also grants FSR's motion for judgment as a matter of law on the issue of punitive damages.  The Court corrects its earlier statements about Harrington, who is not properly part of the retrial, and denies his motions as moot.[2]

I.

Aqua is a two-tower condominium complex located in downtown Long Beach, California.  Each tower has its own homeowners' association—Aqua 388 Community Association and Aqua 488 Community Association.  The two towers share a parking structure, for which Aqua Maintenance Corporation is responsible.  Each of the three Aqua entities has its own board of directors.  At all relevant times, Defendant Christopher Harrington was an employee of FSR, a property management company, and served as the general manager of the Aqua properties.

A.

Adams purchased a condominium in the Aqua 388 complex in late 2016 and moved into her unit on February 20, 2017.  Her unit came with a deeded parking spot.  Adams, a paraplegic, drives a wheelchair accessible van, which she can only enter and exit through a ramp on the passenger side that requires eight feet of clearance.  Her deeded parking space was a standard, nonaccessible space sandwiched between two other standard, nonaccessible spaces.  She was therefore unable to use it.

Starting on January 21, 2017, Adams made a series of requests for an accessible parking spot, which were denied.  In May 2017, at Harrington's suggestion, Adams attended an Aqua 388 board meeting, where she again asked for an accessible parking spot.  At the meeting, Joan Stiehl, a board member, told

---

[2] The retrial in this case took place in December 2024 and was conducted in accordance with the rulings below.  The purpose of this order is to further explain and clarify the Court's December 5, 2024 summary order on the post-trial motions that were filed in connection with the first trial.  This order does not address the post-trial motions that were submitted in connection with the second trial, and any reference to a "new trial" below refers to the retrial that has already occurred.

2

Adams that she was at fault for buying a condominium that did not have accessible parking and that she should "sell and go." Dkt. No. 229 at 308. Harrington told Stiehl that her comments were inappropriate. Dkt. No. 228 at 81. The board did not respond to Adams's request at the meeting but instead contacted its attorney, Michael Rabkin.

On May 31, 2017, Rabkin drafted a letter, submitted to Adams on behalf of the Aqua 388 board, denying the request to "permanently assign[] one of its handicap parking spaces to [her]." Tr. Ex. 216. Rabkin appeared to treat the request as one for a better-located parking spot rather than a request for one that could accommodate a wheelchair accessible van. He explained that "[Aqua] has numerous handicap parking spaces available on each of its three levels of parking available on a first-come, first-served basis" and that Adams was not entitled to the requested accommodation for the following reasons: (1) there was no "nexus" between her disability and the request because she could park in one of the designated handicap parking spaces and use her power wheelchair to get to her condominium unit; and (2) Aqua 388 could not provide her with her own handicap parking space, at the expense of others with similar needs, because it was "obligated to treat all residents with handicap parking placards the same." *Id.*

Almost a year later, Aqua adopted new rules, requiring vehicles parked in unassigned accessible spaces to move every three days. After receiving several citations, Adams requested that the three-day rule be waived for her. Harrington forwarded the request to Aqua Maintenance, but Adams never received a response. Adams sent another email in June 2018 requesting a "permanent accessible parking spot." Tr. Ex. 17. Harrington stated that he would place the request on the agenda for the next Aqua Maintenance board meeting.

Ultimately, Defendants assigned Adams an accessible parking space. The parties dispute the precise date when the accommodation was made. It occurred between April 2019 and February 2020.

B.

Adams initially brought her dispute to the U.S. Department of Housing and Urban Development (HUD). This lawsuit followed.

In March 2018, after several of her accommodation requests had been denied, Adams filed an administrative complaint. As required by 42 U.S.C. § 3610, the HUD Secretary investigated and eventually issued a § 3610(g)(2)(A) charge of discrimination in September 2022. Defendants elected to resolve the

claims in a civil action in federal court under § 3612(a) rather than by an administrative law judge.

The Attorney General then commenced this action, as required by § 3612(o). In April 2023, the United States brought an FHA discrimination claim for failing to reasonably accommodate a disability under 42 U.S.C. §§ 3604(f)(2)(A) and 3604(f)(3)(B). The United States moved for partial summary judgment on liability in September 2023, which the Court granted. Dkt. Nos. 32, 37. In their papers, neither the United States nor Defendants distinguished among Defendants, instead treating them as collectively responsible or not responsible for the failure to accommodate. After the Court's liability finding, the parties attempted to resolve the remaining issues of damages and injunctive relief by mediation. Dkt. No. 41.

In December 2023, the United States and Defendants reached an agreement on a consent decree but noted that Adams had not agreed to settle her claims. Dkt. Nos. 50–51. The Court entered the consent decree, the United States was terminated from the case, and Adams was permitted to intervene to proceed to trial on damages only. Dkt. Nos. 53, 65.

C.

Shortly before trial, Defendants complained that Adams had untimely disclosed videos containing disturbing information that was reported by Mashon Latimer, an employee of G4S—a security contractor hired by the Aqua boards. As captured by the recordings, Latimer told Adams that highly offensive sexual jokes about her had been made at work meetings attended by Harrington. Dkt. No. 76. The Court continued the trial, Adams substituted in new counsel, and the parties filed an in limine motion disputing the admissibility of the videos and Latimer's anticipated testimony about their contents. Dkt. Nos. 92, 105, 125. Relying in large part on the parties' repeated representations that the offensive comments were attributable to Harrington, the Court allowed Latimer to testify about the offensive jokes. Dkt. Nos. 139–140.

Separately, Adams moved in limine to exclude Rabkin from testifying. Dkt. No. 129. Defendants intended to call him to show that they lacked the requisite state of mind for punitive damages because they had relied on his advice when denying Adams's request for a wheelchair accessible parking spot. *Id.* at 7. Adams's counsel argued that allowing an attorney to testify about his opinion that Adams was not legally entitled to the requested accommodation would confuse the jury, since liability had already been decided. *Id.* at 5. After weighing the

probative value against the risk of undue prejudice, jury confusion, and needless consumption of time, the Court granted the motion and excluded Rabkin from testifying. Dkt. No. 155. While the evidence was highly probative, the Court concluded that Defendants could admit evidence of their reliance on Rabkin's advice through other witnesses, including Harrington and Aqua board members. *Id.*

At Defendants' request, the Court bifurcated the trial. Dkt. No. 163. In the first phase, the jury was asked to determine the amount of compensatory damages and which defendants, if any, were liable for punitive damages. Dkt. No. 217. In the second phase, the jury was asked to determine the amount of punitive damages each liable defendant was required to pay. Dkt. No. 218. Defendants made a central theme of their case at trial that they had done the only responsible thing when faced with Adams's request: contacted an attorney and asked for legal advice. Dkt. Nos. 228–232. They returned to this theme with multiple witnesses, in opening statements, and in closing arguments. *Id.* While recognizing that Rabkin may have gotten it wrong, they argued that their choice to rely on him for advice precluded a finding that they were liable for punitive damages.

Adams presented substantial evidence of damages at trial. She testified that before she was assigned an accessible space, she would circle the parking garage looking for an available, unassigned accessible spot. *See, e.g.*, Dkt. No. 229 at 301–05. Cycling through all three garage levels required her to exit the garage onto Long Beach streets and re-enter a different level of the garage through a separate entrance. *Id.* This process took Adams at least 30 minutes approximately four times a week, and up to three hours in extreme cases. *Id.* Occasionally, Adams would eat dinner in her minivan because she could not find a space. *Id.* On days with events in downtown Long Beach, Adams would not leave her condominium for fear that she would not find parking, which led to her cancelling classes she taught as a college professor. *Id.*

Moreover, Adams testified that Latimer had told her of the highly offensive sexual statements made about her that were repeated at a meeting of FSR staff; that she was a survivor of sexual assault; and that she feared for her safety since "these people have keys to [her] unit." Dkt. No. 229 at 324–25. She testified that the cumulative emotional toll of years of feeling bullied in her home and being unable to leave without risking a stressful search for parking caused her extreme emotional pain, leading to a depression so severe that she contemplated committing suicide. *E.g.*, *id.* at 312, 327.

At the close of Adams's case, Defendant FSR moved for judgment as a matter of law under Rule 50(a) on the issue of punitive damages, arguing that Adams had presented no evidence demonstrating corporate liability for punitive damages against it. Dkt. No. 230 at 450–51. The Court deferred ruling on the motion, which FSR renewed at the close of Defendants' case. *Id.* at 558.

### D.

During Adams's rebuttal argument, her counsel, Brian Olney, emphasized that the jury should consider not only the evidence presented but also the evidence not presented. He then made the following argument:

> [W]hat's the evidence we didn't hear? Well, there's all this talk about the lawyer, the—the defendants' lawyer who—who was providing the advice that all the defendants relied upon. Where's the lawyer?

*Id.* at 638. This argument prompted an objection from defense counsel that was sustained. In sustaining the objection, the Court explained to the jury that they had not heard from Rabkin because he had been excluded (without disclosing that the exclusion had been at Adams's request) and noted the impropriety of the argument:

> Members of the jury, the Court excluded the lawyer from testifying, which is why you did not hear from him. And, counsel, that argument is improper.

*Id.* at 638–39. Olney apologized and gave the remainder of his rebuttal argument.

After the jury retired, the Court noted the seriousness with which it viewed Olney's conduct, gave Olney an opportunity to explain himself, and indicated that it would take further action on his conduct. *Id.* at 648–50. FSR renewed its Rule 50 motion, on which the Court again deferred ruling. *Id.* at 651. That evening, the Aqua Defendants moved for a mistrial on the basis of Olney's rebuttal argument. Dkt. No. 195. The Court issued an order to show cause (OSC) re sanctions the following morning. Dkt. No. 197.

The jury returned a verdict the next day, awarding $4,000,000 in compensatory damages against the Aqua Defendants and FSR—but not Harrington—and finding the three corporate defendants liable for punitive damages. Dkt. No. 211. The trial proceeded to phase two, which involved a single witness who testified about the three corporate defendants' financial condition. Ultimately, the jury returned a verdict awarding $500,000 against Aqua 388,

$250,000 against Aqua Maintenance, and $4,500,000 against FSR in punitive damages.  Dkt. No. 212.

### E.

In light of the mistrial motion and other anticipated motions, the Court set a briefing schedule for all post-trial motions.  Dkt. No. 199.  No party objected to this procedure.  Pursuant to a briefing schedule, FSR moved for judgment as a matter of law under Rule 50(b), the Aqua Defendants moved for a mistrial (replacing their earlier-filed motion) and a new trial under Rule 59, and Olney filed a written response to the OSC.  Dkt. Nos. 201, 203, 205, 223.  The Court issued a tentative ruling and heard argument on the motions on August 9, set the matter for a new trial, and took the motions under submission.  On December 5, 2024, the Court issued a two-page order ruling on the motions, stating that it would be followed by a further explanation.  Dkt. No. 293.

### II.

The Court begins by addressing an error in its December 5 order.

As noted, the jury in the first trial found Harrington not liable for either compensatory or punitive damages.  After Defendants filed their post-trial motions, however, the Court misremembered the verdict as having awarded compensatory damages against all defendants, including Harrington.  The Court's tentative ruling, which was provided to the parties before the August 9 hearing, granted Harrington a new trial on this mistaken assumption, stating: "Because compensatory damages were awarded jointly against all Defendants, and because it would be unjust to leave the tainted verdict in place against FSR and Harrington alone, the Court exercises its authority under Rule 59(d) to grant a new trial on compensatory damages for all Defendants."  The Court repeated its mistake at the hearing.  Dkt. No. 241 at 5:8–10 ("[W]hen I say 'FirstService,' I also intend to include Harrington, who . . . neglected to file a Rule 59 motion.").  Of course, having prevailed at trial, Harrington had no reason to file a Rule 59 motion.  No party brought this error to the Court's attention at the August 9 hearing or at any point thereafter.  Based on this continued misunderstanding, which remained uncorrected in the four months after the hearing, the Court stated in its December 5 order that "a new trial is granted on compensatory and punitive damages against the Aqua Defendants and, pursuant to the Court's authority under Rule 59(d), on compensatory damages against Harrington and FSR."  Dkt. No. 293 at 1.

After the second trial began, Harrington filed two motions, one under Rule 50(a) and one under Rule 59(e), arguing that he should not be included in the retrial. Dkt. Nos. 310, 312. Although Harrington should have raised this issue sooner, and his motions are to say the least procedurally questionable, the Court need not reach his motions. Instead, the Court sua sponte corrects its earlier rulings, which were plainly based on an incorrect factual predicate—that the jury had found Harrington liable for compensatory damages in the first trial. *See* Fed. R. Civ. P. 60(a) ("The court may correct . . . a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice."). Adams has already had a full opportunity to try her case against Harrington, and the jury determined that he was not liable for any damages. There is no basis to disturb this verdict. The reason for permitting a retrial, addressed below, is the misconduct of Adams's counsel that likely tainted the verdict against the other defendants. Under these circumstances, it would be manifestly unjust to deprive Harrington of the jury's determination that he is not liable for damages by subjecting him to potential liability for the same conduct a second time. Adams has not identified any authority to suggest that such an outcome would be appropriate.

Adams's only colorable argument for retrying Harrington is her assertion that he asked for a new trial. The record does not support this contention. At the August 9 hearing, the Court asked Roger Frederickson, then counsel for both FSR and Harrington, whether he "want[ed] the Court to exercise its authority under Rule 59(d) or not," and Frederickson replied, "Yes, Your Honor." Dkt. No. 241 at 23:20–22. That statement, upon which Adams's argument hangs, was unclear as to whether Frederickson was answering for FSR, Harrington, or both. But the context undercuts the suggestion he intended to request a new trial on behalf of Harrington. Just before answering, he mentioned the "conflict of interest at the end of the verdicts"—presumably referring to the difference in outcome as to his two clients. *Id*. at 23:9–10. Although the Court followed up by stating that "there is no Rule 59 motion before [it] . . . that challenges the compensatory damages as it applies to FirstService or Harrington," reiterating its mistaken assumption, it then went on to discuss the verdict against FSR. *Id*. at 24:7–24. Frederickson later returned to the issue as to FSR only, stating that "There were specific reasons on the short notice of the briefing that this Court gave for this motion that my client FirstService cannot join in the motion [for a new trial]." *Id*. at 31:2-5. On this record, the Court cannot conclude that Harrington unambiguously requested that his fully favorable jury verdict be set aside and that he be subjected to a new trial.

Accordingly, the Court amends its December 5 order to clarify that the verdict in favor of Harrington has not been disturbed by any of the post-trial motions, Harrington is no longer a defendant in the second trial, and Harrington's motions for relief are denied as moot.

### III.

The Court next addresses FSR's Rule 50 motion, which contends that there was insufficient evidence at trial to support an award of punitive damages. Dkt. No. 201.

### A.

To prevail on a Rule 50 motion, the moving party bears the burden to show there is no evidence upon which a jury might reasonably render a verdict against it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To withstand such a motion, the verdict must be supported by more than a "mere existence of a scintilla of evidence." *Id.* The court must view the evidence in the light most favorable to the party against whom the motion is made and give that party the benefit of all reasonable inferences. *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1086 (9th Cir. 2014).

An award of punitive damages under the FHA is governed by federal law. *United States v. Tropic Seas, Inc.*, 887 F. Supp. 1347, 1365 (D. Haw. 1995). Corporate liability for punitive damages under federal law follows common-law principles, including those of agency. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 537, 542–43 (1999) (discussing standard in Title VII context); *see also Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 539 (2015) (applying Title VII principles to FHA based on similarity in statutes); *Holland v. Related Companies, Inc.*, No. 15-CV-03220, 2017 WL 3086104, at *7 (N.D. Cal. July 20, 2017) (applying *Kolstad* to FHA punitive damages). Under those principles, as relevant here, the liability-inducing actions of an agent-employee can be imputed to his principal-employer when the employee was serving in a managerial capacity and acting in the scope of his employment. *Kolstad*, 527 U.S. at 542–43, 545. For an employee to be acting in a "managerial capacity," he or she must be "important, but perhaps need not be the employer's top management, officers, or directors." *Id.* at 543 (cleaned up). Where this principal-agent relationship has been shown, the principal is liable for the agent's tortious acts.

Consistent with these legal principles, the jury was instructed that it could award punitive damages if it found that "the conduct of [FSR], or the conduct of [its] employees or agents acting within the course and scope of employment, that harmed the Plaintiff was malicious, oppressive or in reckless disregard of the Plaintiff's rights."  Dkt No. 217 ¶ 13 (jury instructions).  Additionally, the jury was instructed that it could only do so "if the Plaintiff prove[d] by a preponderance of the evidence that an officer, director, or managing agent of the Defendant acting in the scope of employment participated in, knew about, and/or ratified the actions that were malicious, oppressive, and/or in reckless disregard of the Plaintiff's rights."[3]  *Id.*

B.

Adams pursued a theory of corporate liability against FSR based primarily on the conduct of its employee Harrington.  However, she failed to produce sufficient evidence that he engaged in conduct warranting punitive damages or sufficient evidence that any FSR employee acted in a managerial capacity when addressing Adams's request for a permanent accessible parking space.

On direct examination of Latimer, counsel for Adams elicited testimony that Harrington had stated to others that Adams was "mean" and "being a bitch."  Counsel also elicited inflammatory evidence that Harrington once believed that

---

[3] The jury instructions largely reflect the submissions of the parties, which often referenced California law where no Ninth Circuit Model Jury Instruction could be located.  The California standard of corporate liability for punitive damages, like federal law, generally relies on common-law agency principles.  *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 822 (1979) ("In a broad sense, it is correct to state that California follows the Restatement rule regarding assessment of punitive damages against a principal.").  While California law defines managing agent somewhat differently, the federal standard appears at least as broad.  *Compare White v. Ultramar, Inc.*, 21 Cal. 4th 563, 566–67 (1999) ("[T]he term 'managing agent' . . . include[s] only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy."), *with Kolstad*, 527 U.S. at 543 ("[T]he examples provided in the Restatement of Torts suggest that an employee must be important, but perhaps need not be the employer's top management, officers, or directors, to be acting in a managerial capacity.") (cleaned up).

10

Latimer was a white supremacist[4] and that he was present at a meeting when highly offensive sexual comments were made about Adams.  Dkt. No. 228 at 118–19.   On cross-examination, Latimer clarified that he was wrong to believe that Harrington was a white supremacist and that Harrington never said the offensive sexual comments, was displeased by them, and cut off the conversation.  Dkt. No. 229 at 224–25.  The testimony also showed that, when Harrington heard Aqua board member Stiehl ask a question at the May 2017 board meeting that he thought violated Adams's rights, Harrington told her that the question was inappropriate. Dkt. No. 228 at 81.  Ultimately, the jury rejected Adams's suggestion that Harrington engaged in the malicious and despicable acts attributed to him and found that he was not liable for any damages.

Most of the evidence about Harrington showed that he responded to Adams's requests by forwarding them to entities that could assist, either by speaking with Rabkin on the phone or by notifying the board of directors; that he informed Adams of the date and time of the board of directors' meeting; and that his job involved implementing the directions of the homeowners' associations.  *See id.* at 78, 81, 88–89, 95, 99, 103.  Some of the evidence presented appeared exculpatory:  he told a board member that her questions were inappropriate, and he shut down the sexually offensive comments that were repeated in his presence.  By contrast, the principal inculpatory evidence presented at trial of Harrington's state of mind that was actually attributable to him was his comment that Adams was mean and "being a bitch."  The jury concluded that this was not enough; and the Court finds that it would be insufficient as a matter of law to find Harrington liable for punitive damages, as it amounts to, at best, a mere "scintilla of evidence." Evidence that is insufficient to establish Harrington's liability is necessarily insufficient to establish FSR's liability under common-law agency principles.  If Harrington committed no tortious conduct justifying punitive damages, then there is no such conduct to impute to FSR as his employer.  Accordingly, there was insufficient evidence for a reasonable jury to award punitive damages against FSR based on the conduct of Harrington.

In response, Adams argues that the Court cannot consider the jury's verdict on Harrington's liability because FSR did not argue that the verdict precluded a finding of liability against FSR in its Rule 50(a) motion.  *See E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) ("A party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.") (cleaned up).  The

---

[4] No objection was made to the inflammatory statement about Latimer's belief.

Ninth Circuit applies a "liberal interpretation" to Rule 50(b), holding that it "may be satisfied by an ambiguous or inartfully made motion" under Rule 50(a). *Go Daddy Software*, 581 F.3d at 961; *Millennium Drilling Co. v. House-Meyers*, 744 F. App'x 347, 349 (9th Cir. 2018).

> Adams's argument is unpersuasive.  FSR's Rule 50(a) motion was broad:

> There's been no evidence introduced by the plaintiff in the case showing the corporate liability for punitive damages.  None.  They have not introduced any evidence.

Dkt. No. 230 at 45.  This statement was broad enough to encompass at least two theories:  (1) there was insufficient evidence that Harrington was a managing agent; and (2) there was insufficient evidence to satisfy the punitive damages threshold.[5]  At trial, the Court construed the statement to refer to the first theory and discussed with the parties the appropriate legal standard for a managing agent. FSR did not agree or otherwise state that the Court's construction represented the outer limits of the grounds for its motion, and the phrasing of the motion as reported in the transcript does not so limit it.  Applying the Ninth Circuit's "liberal" standard, Rule 50(b)'s requirements were satisfied by FSR's Rule 50(a) motion, however "ambiguous or inartfully made." *GoDaddy Software*, 581 F.3d at 961.  The Court thus rejects Adams's argument that it cannot consider the insufficiency of the evidence supporting Harrington's liability for punitive damages.

Even if the Court were to accept the procedural argument, there was insufficient evidence to show that Harrington's conduct could be imputed to FSR. Adams asserts that Harrington acted in a managerial capacity because he had substantial discretion over accommodation requests and accessible parking issues. She contends that he created ad hoc policy for FSR at Aqua because FSR provided no guidance, policy, or rules on these issues.  But the evidence does not support Adams's contention.  There was no evidence that FSR empowered Harrington to

---

[5] Adams appears to misstate FSR's argument.  The argument is not, as Adams suggests, that the verdict in favor of Harrington legally controls the verdict as to FSR.  Rather, FSR appears to argue that it cannot be held liable for punitive damages on an agency theory if there is insufficient evidence to establish punitive-damage liability for its agent.  Dkt. No. 234 at 6 ("The verdict is evidence of this . . . .  How could FirstService be found liable for punitive damages, if its alleged managing agent was not so found?").

set policy or that FSR had a duty as a property management company to train its general managers to provide legal guidance on compliance with federal laws.

The undisputed evidence demonstrated that Harrington directed Adams to submit her accommodation request to those who had the authority to decide whether to grant it—the Aqua boards. The boards then solicited a legal opinion from a lawyer. While Harrington provided general guidance and assistance to the Aqua boards, *id.* at 62, the boards ultimately made the decisions, *see id.* at 86–87, 109 (describing the board's rulemaking process). For purposes of parking, Harrington explained that his role was largely limited to enforcing the decisions made and rules set by the Aqua boards. *See* Dkt. No. 228 at 62; *id.* at 91 (noting that Harrington would review parking citations to ensure they complied with Aqua's rules); *id.* at 98–99 ("If there was a homeowner issue that was addressed by the rules, then I would basically apply the rules in that case. If it was something outside the rules, I would either go to the board or to legal counsel to clarify."); *id.* at 77–78 (noting that Adams's car would have to be towed "[a]ccording to the rules" if she parked there too long). In short, Adams has not shown that Harrington's role allowed him to make any "independent decisions" about whether to assign her an accessible parking space, which was a matter for the Aqua boards. *See Ward v. AutoZoners, LLC*, 958 F.3d 254, 265–66 (4th Cir. 2020) (holding that sales manager who could only make recommendations about hiring and staffing and had limited authority and discretion was not managerial employee, such that her conduct could not be a predicate for her employer's liability for punitive damages) (quotation omitted). Nor has Adams demonstrated that Harrington's role in enforcing rules enacted by the boards qualifies him as a managing agent of FSR. *Cf. Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 823 (1979) (insurance claims manager who made decisions with "little if any supervision" and had "ultimate supervisory and decisional authority" over the disposition of claims was a managing agent).

Adams next argues that even without Harrington, a jury could have found FSR liable for punitive damages based on the remaining evidence, which she identifies as: "the cumulative actions of Rebecca Hawkins . . . , the [FSR] employees who repeated and/or laughed about the sexual assault jokes about Plaintiff at the [FSR] meetings, and [Harrington]'s own denials of Plaintiff's requests." Dkt. No. 222 at 10. But there was no evidence at trial to support a finding that Hawkins or any other FSR employee was a managing agent of FSR. So their conduct is not imputable to FSR, even if it met the standard for punitive damages, which the Court doubts.

Accordingly, the Court grants FSR's Rule 50(b) motion for judgment as a matter of law.

IV.

The Aqua Defendants move for a mistrial and for a new trial under Rule 59. The Court construes the mistrial motion as part of the Rule 59 motion and addresses them together.[6] *Cf. United States v. Alvarez-Moreno*, 657 F.3d 896, 900–01 (9th Cir. 2011) ("Instead of coming within the authority to grant a mistrial . . . the district court's authority to order a new trial *after* a verdict has been entered is governed by [the rule of procedure for new trial motions]").

A.

Federal Rule of Civil Procedure 59 authorizes the Court to grant a new jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). "A new trial is warranted on the ground of attorney misconduct during the trial where the flavor of misconduct sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995) (cleaned up). Where an improper comment during closing argument deliberately "undermines [the opposing party's] credibility on the determinative issue in the case," the misconduct sufficiently permeates the entire proceeding to warrant a new trial. *Globefill Inc. v. Elements*

---

[6] Before the jury returned a verdict, the Aqua Defendants moved for a mistrial. Dkt. No. 195. The Court deferred ruling and set a briefing schedule for the parties' post-trial motions. On their motion deadline, the Aqua Defendants filed both a motion for a mistrial (renewing their previously filed motion) and a separate motion for a new trial under Rule 59. Dkt. Nos. 203, 205. The mistrial motion focused exclusively on Olney's misconduct during rebuttal argument, while the new trial motion incorporated the arguments of the mistrial motion and asserted other grounds. No party has cited authority for the propriety of ruling on a motion for mistrial after the jury has rendered its verdict. In any event, the relief sought is the same: the granting of a new trial.

*Spirits, Inc.*, 640 F. App'x 682, 684 (9th Cir. 2016); *see also Maricopa Cnty. of State of Ariz. v. Maberry*, 555 F.2d 207, 219 (9th Cir. 1977) (ordering new trial based on counsel's improper question asked "with the sole purpose of bringing to the jury something it should not have heard").

### B.

The principal basis for the new trial motion is Adams's improper rebuttal closing argument. The Court finds that the argument was improper and cannot stand because it undermines confidence in the integrity of the verdict.

### 1.

The rebuttal argument was undisputedly improper. As the Court explained in its OSC, the "where is the lawyer?" argument was made after Adams moved in limine to exclude Rabkin's testimony. After full briefing, oral argument, and an offer of proof about Rabkin's anticipated testimony, the Court granted Adams's motion to exclude this evidence and denied the defense motion for reconsideration. Dkt. Nos. 155, 163. In granting the motion, the Court reasoned in part that Defendants could present evidence of their reliance on their lawyer's advice through other witnesses. Consistent with that ruling, one of Defendants' central themes at trial was that they were not liable for punitive damages because they had acted in good faith by referring the matter to their lawyer and relying on his advice, even if it later turned out to be wrong.

The rebuttal argument was a direct and deliberate attempt to undercut this reliance-on-counsel defense by implying that Defendants were lying. If Defendants were *really* relying on the advice of their lawyer, Olney argued, the jury would have heard from him. *See* Dkt. No. 230 at 638 ("[T]here's all this talk about . . . the defendants' lawyer who was providing the advice that all the defendants relied upon."). Since the jury did not hear from him, the argument suggested, it follows that Defendants were not really relying on the advice of their lawyer. *Id.* ("And what's the evidence we didn't hear? . . . Where's the lawyer?"). Without the ability to credibly claim they were relying on the advice of their lawyer, Defendants' repeated denials of Adams's requests for parking accommodations appeared much more like "reckless disregard of the Plaintiff's rights." Dkt. No. 217 ¶ 9 (jury instructions on punitive damages). On a more fundamental level, Olney's argument challenged the credibility of the reliance-on-counsel defense, asking the jury to draw an adverse inference that Defendants had not called Rabkin because his testimony would not support their claim of a good

faith reliance on an objectively and independently prepared legal opinion.  Indeed, Olney attempted to paint Rabkin as a lawyer who was bought and paid for, arguing that Defendants had retained him merely "to get a justification for a decision they had already made."  Dkt. No. 230 at 581.

It was a prejudicial argument, aimed at removing the core pillar of the defense strategy and replacing it with Adams's own portrayal of Rabkin as someone Defendants hid behind while directing him to do their bidding.  Yet Olney knew that the adverse inference he invited the jury to draw was false.  Defendants tried to call Rabkin, and they tried very hard:  opposing a motion in limine, arguing at the hearing on the motion, and moving for reconsideration of the exclusion order.  It was thus both false and unfair to imply that Defendants' failure to present Rabkin's testimony suggested that they were not relying in good faith on counsel.

The Court intended to respond quickly to dispel any prejudice from Olney's remark, and it did so by revealing the general reason that Rabkin was not called: the Court excluded him from testifying.  With the benefit of hindsight, this instruction does not fully address the prejudice.  Olney's argument drew the jury's attention to Rabkin's absence, from which the jury was encouraged to draw inferences adverse to Defendants.  The Court's response eliminated a subset of those inferences:  after the instruction, the jury knew that Defendants could not have called Rabkin because of a court order.  But they did not know *why* the Court ordered him excluded and could have concluded that Rabkin was excluded because he would not support the arguments made by the defense.  The Court's curative instruction did not address this potential adverse inference.  *See Maberry*, 555 F.2d at 217–18 (granting new trial even though trial court immediately admonished jury to disregard statement, because "[counsel's statement] was error, and any impression it made upon the jury could not be wiped out by an ordinary instruction to disregard it").

2.

The Court finds that the misconduct caused prejudice that "permeated the entire proceeding."  *Globefill*, 640 F. App'x at 684 (cleaned up).  Perhaps most significantly, the argument falsely undermined Defendants' credibility on a major issue in the case—i.e., whether they had the requisite mental state to warrant punitive damages.  The extent of the prejudice, moreover, was not necessarily limited to the punitive damages award.  Because this was a bifurcated trial, the jury did not know when it first retired to deliberate that it would be asked to determine

16

a punitive damages amount later.  The jury was asked instead to determine the amount of compensatory damages and which defendants, if any, would be liable for punitive damages.  The jury returned a verdict for $4,000,000.  Given the nature and severity of the improper argument, the Court finds that "the jury was influenced by passion and prejudice in reaching its verdict." *Anheuser-Busch*, 69 F.3d at 346.[7]

The type of misconduct committed here provides grounds for a new trial under Rule 59(a)(1)(A).  *See, e.g., Maberry*, 555 F.2d at 217–18.  In *Maberry*, plaintiff's counsel improperly asked a defense witness during cross-examination witness if he had said off the record in his deposition, "Come on, Ken. You've got a damned good case and you know it." *Id*. at 217.  The district court struck the statement, admonished the jury to disregard it, but denied defendant's new trial motion.  *Id.* at 217–18, 223.  The Ninth Circuit reversed, concluding that counsel's conduct was unfairly prejudicial because it was "an intentional act, done with the sole purpose of bringing to the jury something it should not have heard." *Id.* at 219.  Likewise, in *Globefill*, defense counsel referred in closing argument to a document not in evidence, misrepresented its contents, and falsely implied that opposing counsel had deliberately concealed it.  640 F. App'x at 684.  The Ninth Circuit held that, although the misconduct was limited to closing argument, a new trial was required because the improper argument undermined plaintiff's credibility on the determinative issue in the case.  *Id.*

Here, in light of the extensive prior litigation on the issue—including a motion to exclude Rabkin, a motion to reconsider, and disputes over jury instructions in which reliance on counsel played a prominent role—it is difficult to conclude that Olney's statement in rebuttal argument was anything other than "an intentional act, done with the sole purpose of bringing to the jury something it should not have heard." *Maberry*, 555 F.2d at 219.  Especially when viewed in light of the fact the exclusion was a result of a motion that Olney himself brought and orally argued, the Court concludes that "the trial was not fair to the party

---

[7] Adams argues that the adverse inference urged by Olney was not prejudicial because the jury might have drawn that inference without his improper argument.  This argument is meritless.  The theoretical possibility that a jury may engage in improper speculation does not permit a lawyer to invite it.

moving." *Molski*, 481 F.3d at 729 (quotation omitted).  Accordingly, a new trial is warranted.

V.

The Court grants FSR's motion for judgment as a matter of law on the issue of punitive damages.  The Court also grants the Aqua Defendants' motion for a new trial and vacates the jury verdict as to compensatory and punitive damages against them.  Because compensatory damages were awarded jointly against the three defendants found liable, and because it would be unjust to leave the tainted verdict in place against FSR alone, the Court exercises its authority under Rule 59(d) to grant a new trial on compensatory damages for the Aqua Defendants and FSR but on punitive damages only as to the Aqua Defendants.  *See* Fed. R. Civ. P. 59(a) ("The court may, on motion, grant a new trial on all or some of the issues."); *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 499 (1931) ("[W]here the requirement of a jury trial has been satisfied by a verdict according to law upon one issue of fact, that requirement does not compel a new trial of that issue even though another and separable issue must be tried again."); *In re Prempro Prods. Liab. Litig.*, 586 F.3d 547, 573 (8th Cir. 2009) (affirming judgment as a matter of law on punitive damages as to one defendant, reversing as to the other defendant, and remanding for a new trial on punitive damages only against the remaining defendant).  Accordingly, the issues for the new trial are:  (1) which of the entity defendants are liable for compensatory damages; (2) the amount of compensatory damages to be awarded; (3) whether the Aqua Defendants are liable for punitive damages; and (4) if the Aqua Defendants are liable, the amount of punitive damages.

Date: January 22, 2025

_____
Stanley Blumenfeld, Jr.
United States District Judge