UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| EMMA ADAMS,<br><br>      Plaintiff,<br><br>v.<br><br>AQUA 388 COMMUNITY<br>ASSOCIATION et al.,<br><br>      Defendants. | Case No. 2:23-cv-02498-SB-JPR<br><br>ORDER ON DEFENDANTS'<br>POST-JUDGMENT MOTIONS<br>[DKT. NO. 345–348, 353] |

Defendants violated the Fair Housing Act (FHA) by denying Plaintiff Emma Adams's repeated requests for an accessible parking space at her condominium complex, thereby failing to accommodate her disability as required by law. In July 2024, a jury awarded her $4 million in compensatory damages and $5.25 million in punitive damages against Defendants Aqua 388 Community Association, Aqua Maintenance Corporation (collectively, the Aqua Defendants), and FirstService Residential California, LLC (FSR). The Court subsequently granted judgment as a matter of law for FSR on punitive damages and granted the Aqua Defendants' motion for a new trial due to misconduct by Adams's counsel. After a second trial, a jury awarded $7 million in compensatory damages against FSR and the Aqua Defendants and $400,000 in punitive damages against the Aqua Defendants.

The defendants have filed several post-judgment motions. The Aqua Defendants move under Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law on punitive damages and under Rule 59(a) for a new trial or remittitur of the damages award. FSR moves under Rule 59(e) to alter or amend the judgment to exclude it from compensatory damages liability and alternatively under Rule 59(a) for a new trial or remittitur of damages. Defendant Christopher Harrington moves for fees incurred in the retrial. For the reasons stated below, the Court denies all motions other than the motion for remittitur of compensatory damages.

I.

The facts in this case have been described in detail in several other orders and will not be repeated in full here. Below is the background relevant to the second trial and subsequent post-trial motions.

A.

Aqua is a two-tower condominium complex located in downtown Long Beach, California. Each tower has its own homeowners' association—Aqua 388 Community Association (Aqua 388) and Aqua 488 Community Association. The two towers share a parking structure, for which Aqua Maintenance Corporation (Aqua Maintenance) is responsible. FSR, a property management company, was retained to manage Aqua 388 and Aqua Maintenance.

In late 2016, Adams purchased a condominium in the Aqua 388 complex, which came with a deeded parking space. Adams, a paraplegic, drives a wheelchair-accessible van, which she can only enter and exit through a ramp on the passenger side that requires eight feet of clearance. Because her deeded space did not provide sufficient clearance for her wheelchair ramp, she was unable to use it. Beginning on January 21, 2017, Adams made a series of requests for an accessible parking space. The initial requests were denied by Rebecca Hawkins, an employee of FSR, and Hawkins's superior, Christopher Harrington, the general manager of the Aqua property. Harrington suggested that Adams present her request to the Aqua board.

In May 2017, Adams attended an Aqua 388 board meeting and asked for an accessible parking space. The board did not respond to Adams's request at the meeting but instead contacted its attorney, Michael Rabkin. On May 31, 2017, Rabkin drafted a letter, submitted to Adams on behalf of the Aqua 388 board, denying the request, stating: (1) there was no "nexus" between her disability and the request because she could park in one of the designated handicap parking spaces and use her power wheelchair to get to her condominium unit; and (2) Aqua 388 could not provide her with her own handicap parking space because it was "obligated to treat all residents with handicap parking placards the same." Tr. Ex. 216 at 2.

Almost a year later, Aqua adopted new rules, requiring vehicles parked in unassigned accessible spaces to move every three days. After receiving several citations that warned of towing, Adams requested that the three-day rule be waived

for her.  Tr. Ex. 18.  Harrington stated that he would place the request on the agenda for the next Aqua Maintenance board meeting.  *Id.*  Defendants eventually assigned Adams an accessible parking space.

### B.

In October 2023, the Court granted summary judgment on FHA liability, finding that Defendants had unlawfully failed to provide Adams with a reasonable accommodation.  Dkt. No. 37.  The case proceeded to trial on compensatory and punitive damages against FSR, the Aqua Defendants, and Harrington.  The parties stipulated that Plaintiff would not seek damages against Defendant Hawkins.  Dkt. No. 151.

Before trial, the Court granted Adams's motion in limine to exclude Rabkin from testifying.  Dkt. Nos. 129, 155.  It also granted Defendants' request to bifurcate the trial into two phases—compensatory damages and liability for punitive damages in the first phase; and the amount, if any, of punitive damages in the second phase.  Dkt. No. 163.

The parties proceeded to trial in July 2024.  Adams testified at length about being denied an accommodation and the emotional distress it caused her.  In response, Defendants argued that they were following Rabkin's advice and believed they could not assign her a space as requested.  During his rebuttal closing argument, Adams's counsel called the jury's attention to Rabkin's absence from the trial—even though Adams had moved in limine to exclude his testimony.  The Court sustained defense counsel's objection to the argument and admonished Adams's counsel, noting the impropriety of the argument.  The jury awarded $4 million in compensatory damages against all defendants except Harrington and $5.25 million in punitive damages against the Aqua Defendants and FSR.

After the verdict, FSR moved under Rule 50 for judgment as a matter of law on the punitive damages award, which the Court granted.  Dkt. Nos. 201, 293, 381. The Aqua Defendants also moved for a mistrial and a new trial under Rule 59 based on Adams's counsel's improper argument in rebuttal.  Dkt. Nos. 203, 205. Finding that counsel's improper argument tainted the verdict, the Court granted the motion for new trial on compensatory and punitive damages against the Aqua Defendants and compensatory damages against FSR.  Dkt. Nos. 293, 381. However, it ultimately declined to grant a new trial as to Harrington, concluding it would be unjust to deprive him of a favorable verdict due to Adams's counsel's misconduct.  Dkt. No. 381 at 7–9.

Before the second trial, Adams's counsel withdrew from the case, and she
retained new counsel. Dkt. Nos. 268, 271. The Court directed the parties to
submit a joint status report on several issues for the retrial and subsequently issued
an order: (1) permitting Rabkin to testify; (2) excluding testimony elicited during
the first trial about offensive jokes made about Adams; (3) bifurcating the trial; and
(4) amending the jury instructions to clarify the distinction between compensatory
and punitive damages. Dkt. Nos. 293, 302.

During the retrial, Adams again presented substantial evidence of emotional
damages, testifying that she drove around for hours looking for a parking space,
felt demeaned and humiliated, experienced physical symptoms of stress and
anxiety, withdrew from her friends, and contemplated suicide. At the close of their
case, the Aqua Defendants moved for judgment as a matter of law under Rule
50(a) on the issue of punitive damages. Dkt. No. 370 at 625. The Court deferred
ruling on the motion. The jury then awarded Adams $7 million in compensatory
damages, $100,000 in punitive damages against Aqua 388, and $300,000 in
punitive damages against Aqua Maintenance.

The Aqua Defendants now move under Rule 50 for judgment as a matter of
law on punitive damages and for a new trial or remittitur under Rule 59. Dkt. Nos.
346, 347. FSR has filed its own Rule 59 motion for a new trial or remittitur and
additionally moves under Rule 59(e) to alter or amend the judgment to exclude it
from any liability for compensatory damages. Dkt. No. 348. Adams and
Harrington also move for fees and costs incurred during the second trial. Dkt. Nos.
345, 350, 353.

II.

The Court first addresses FSR's Rule 59(e) motion to alter or amend the
judgment to exclude it from any damages liability.

A.

Before turning to FSR's Rule 59(e) arguments, the Court describes the
procedural history related to FSR's liability for compensatory damages.

The government originally filed the complaint in this action, asserting a
single cause of action for violations under the FHA. On September 8, 2023, the
government filed a motion for partial summary judgment, seeking a determination
that Defendants violated the FHA by failing to reasonably accommodate Adams's

disability when they denied her requests for a wheelchair-accessible parking space. In making this request, the government did not distinguish among the defendants. At the time of the motion, all defendants—including FSR and its employees Harrington and Hawkins—were represented by the same lawyers.  Dkt. No. 32. Like the government, defense counsel did not distinguish among the different defendants.  *Id.*  Instead, they argued that Defendants could not be held liable because federal and state law prohibited them from granting the requested accommodation.  As a result, the Court had no occasion to consider whether the question of liability depended on the specific actions of any individual defendant. In its order granting summary judgment, the Court found that all defendants had violated the FHA.  Dkt. No. 37.

After the Court granted summary judgment on FHA liability, the parties proceeded to trial on compensatory and punitive damages.  At trial, Adams pursued an agency theory of damages liability against FSR, asserting that FSR was responsible for the harm she suffered as a result of the actions of its employees, Harrington and Hawkins.  The jury found FSR liable for compensatory and punitive damages but rendered a verdict in favor of Harrington in his individual capacity, finding that he did not harm Adams and was not liable for either compensatory or punitive damages.  Dkt. No. 211.

After the first trial, FSR filed a Rule 50 motion for judgment as a matter of law on punitive damages, and the Aqua Defendants filed motions for a mistrial and a new trial under Rule 59.  Dkt. Nos. 195, 203, 205.  FSR did not file a Rule 50 motion on compensatory damages, nor did it move for a new trial or join the Aqua Defendants' Rule 59 motion.  At the hearing on Defendants' post-trial motions, the Court misremembered that the jury had rendered a fully favorable verdict for Harrington and raised whether FSR and Harrington should be subject to any new trial, even though they had not filed a Rule 59 motion.  Dkt. No. 241 at 4–5.  Roger Frederickson, who represented both FSR and Harrington at the time, stated that he did not join the new trial motion because of "a conflict of interest at the end of the verdicts," presumably an oblique reference to the divergent jury verdict as to his two clients.  *Id.* at 23.  However, when directly asked whether he "want[ed] the Court to exercise its authority under Rule 59(d) or not" to grant a new trial, counsel answered, "[y]es, Your Honor."  *Id.*

The Court took the motions under submission and, still operating on its mistaken recollection that compensatory damages were awarded against Harrington, subsequently issued a summary order granting:  (1) judgment as a matter of law for FSR and Harrington on punitive damages, (2) a new trial against

5

FSR and Harrington on compensatory damages, and (3) a new trial against the Aqua Defendants on compensatory and punitive damages.  Dkt. No. 293.  Based on the Court's ruling, the parties proceeded with the understanding that all defendants would be retried.  Harrington obtained new counsel and appeared at the retrial as a defendant.

After the second trial began, Harrington filed Rule 50(a) and Rule 59(e) motions, arguing for the first time that he should not be retried because the prior jury determined that he was not liable for any damages.  Dkt. Nos. 310, 312; Dkt. No. 366 at 266–68; Dkt. No. 368 at 282–87.  Recognizing its mistake, the Court dismissed him from the retrial, concluding that it would be unjust to subject him to a second trial when he previously prevailed and the retrial was caused by Adams's counsel's misconduct.  Dkt. No. 370 at 636; Dkt. No. 381 at 8.  After the close of evidence, the Court instructed the jury that Harrington had been mistakenly identified as a defendant at the beginning of the trial, that the "evidence in this case may or may not have warranted an award of damages against Mr. Harrington," and that it could "consider Harrington's conduct in deciding the liability of [FSR], his employer," but would "not be asked to determine whether Harrington is liable as a defendant."  Dkt. No. 333 at 3; Dkt. No. 370 at 653–54.

At the conclusion of the second trial, the jury found FSR liable for compensatory damages.  Dkt. No. 335.  FSR now moves under Rule 59(e) to alter the judgment to eliminate its liability for damages.

## B.

Amending a judgment under Rule 59(e) is an "extraordinary remedy which should be used sparingly."  *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (quotation omitted).  "In general, there are four basic grounds upon which a Rule 59(e) motion may be granted: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law."  *Id.*  FSR contends that Rule 59(e) relief is "necessary to prevent manifest injustice" for two reasons.

1.

FSR contends that it cannot be held liable for compensatory damages because such liability is inconsistent with the favorable verdict rendered for Harrington in the first trial. According to FSR, it could only have acted through Harrington, and the first jury's finding of no damages against him necessarily precludes a finding of compensatory damages against it in the second trial. Dkt. No. 348 at 7 n.1, 8.

This argument is not without force. In both trials, Adams premised FSR's liability on Harrington's conduct, suggesting that the first jury's finding that he did not cause her harm may be inconsistent with a damages award against FSR.[1] *But see Int'l Longshoremen's & Warehousemen's Union v. Hawaiian Pineapple Co.*, 226 F.2d 875, 881 (9th Cir. 1955) (allowing verdict to stand despite the "logical inconsistency in the jury's finding [the principals] liable and exonerating the individual defendants" who acted on their behalf). The Court, however, rejects this argument on procedural grounds.

FSR has provided no authority allowing a party to challenge an inconsistent verdict on a motion to amend or alter a judgment. *See Allstate Ins.*, 634 F.3d at 1111 (describing the limited grounds for a Rule 59(e) motion). And even if FSR could bring this challenge under Rule 59(e), its motion is untimely. A Rule 59(e) motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008) (cleaned up). The motion in this case comes too late: FSR was aware of the inconsistency after the first trial, and yet it waited until after the verdict in the second trial to raise the issue.

In addition, FSR has waived any inconsistency challenge. After the first trial, FSR argued in its Rule 50 motion that it could not be liable for punitive damages because of the jury's verdict in favor of Harrington. Dkt. No. 201 at 9.

---

[1] Adams now briefly argues that the verdict is consistent because Hawkins also rejected her accommodation requests. Dkt. No. 365 at 28. The trial evidence, however, does not support the conclusion that Hawkins could have substantially caused Adams's harm. She was a relatively low-level associate who had no contact with the Aqua boards, no decision-making authority, and merely forwarded Adams's requests to Harrington. *See* Dkt. No. 366 at 244 (testimony by Harrington that Hawkins did not have power to make decisions on requests by Aqua residents); *see also* Dkt. No. 368 at 452–53; Tr. Ex. 34.

Although the same reasoning would apply to an award of compensatory damages, FSR did not contend that the award was inconsistent with the Harrington verdict. Instead, at the hearing on the post-trial motions, FSR requested a new trial on the issue of compensatory damages.  Dkt. No. 241 at 23.[2]  And during the second trial, FSR agreed to an instruction that permitted the jury to consider Harrington's conduct in determining whether FSR was liable for compensatory damages.  Dkt. No. 333 at 3; Dkt. No. 370 at 633–37.  Having agreed to a new trial, and having agreed to an agency instruction, FSR has waived any claim that it should not have been subjected to a second trial.  *See United States v. Depue*, 912 F.3d 1227, 1232 (9th Cir. 2019) ("[W]aiver is the intentional relinquishment or abandonment of a known right.") (cleaned up); *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (Rule 59(e) motion "may *not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation").

## 2.

FSR next contends that it cannot be liable for compensatory damages because, without authority to grant Adams's requested accommodation, it lacked the means to cause her harm.[3]  Once again, FSR's argument fails on procedural grounds.

According to FSR, the trial evidence established that the Aqua boards had exclusive authority over parking-space allocation at the Aqua towers, and that FSR had no ability to accommodate Adams even if it wanted to.  Dkt. No. 366 at 229–

---

[2] Frederickson did not state whether he was requesting a new trial on behalf of both FSR and Harrington.  As explained in a prior order, however, the record supports the conclusion that he only requested a new trial for FSR.  *See* Dkt. No. 381 at 8 (finding Harrington did not request that the Court set aside his favorable jury verdict and subject him to a new trial).

[3] FSR also argues that it cannot be held liable for damages because Harrington's and Hawkins's actions were taken in their roles as agents of the Aqua Defendants, not as agents of FSR.  Dkt. No. 348 at 10.  However, the jury instructions—which FSR agreed to—provided that Harrington and Hawkins "were acting within the scope of their authority as employees of [FSR] when they denied Plaintiff's requests."  Dkt. No. 333 at 4; *see also* Dkt. No. 148 at 18 (stipulation that Harrington and Hawkins were acting within the scope of their authority as employees of FSR when they denied Adams's requests).

30; *see also* Dkt. No. 370 at 620 (testimony from Aqua 388 board member that Harrington lacked authority to assign another space to Adams). At bottom, this argument challenges the sufficiency of the evidence—an issue that must be raised through a Rule 50(a), not a Rule 59(e), motion. *See* Fed. R. Civ. P. 50(a) (requiring motion for judgment as a matter of law to be made before case is submitted to the jury); *Allstate Ins.*, 634 F.3d at 1111 (noting the limited grounds for bringing a Rule 59(e) motion).

The Rule 59(e) motion is denied.

### III.

The Court next addresses Harrington's motion for attorney's fees. He seeks $33,177 in fees incurred in connection with the retrial. Dkt. Nos. 345, 353. The motion is meritless.

Because he was dismissed during the retrial, Harrington contends that he is a "prevailing party" entitled to fees under the FHA. *See* 42 U.S.C. § 3613(c)(2) ("[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee."). However, Harrington can only recover fees under the FHA if Adams's claim was "frivolous, unreasonable, or groundless." *Green v. Mercy Hous., Inc.*, 991 F.3d 1056, 1058–59 (9th Cir. 2021) (cleaned up). The claim against him does not satisfy that standard. Indeed, the Court previously found that Harrington violated the FHA when it granted the government's motion for summary judgment. Dkt. No. 37. As explained, Harrington and FSR did not oppose the motion on any ground separate from the Aqua Defendants, and Adams has twice prevailed against those defendants.

Harrington presses yet another meritless argument. He contends that the claims against him in the second trial were frivolous because the first jury had already returned a verdict in his favor. But Adams cannot be faulted for his participation in the second trial, which resulted from the Court's mistaken recollection about the full scope of the first verdict. While the Court accepts responsibility for that error, no party corrected it before the retrial—not even Harrington's counsel, who had every incentive to do so yet raised the issue only after the second trial had begun.

Thus, Harrington's motion for fees is denied.

IV.

The Court now proceeds to the Aqua Defendants' Rule 50 motion for judgment as a matter of law on the question of punitive damages.

A.

To prevail on a Rule 50 motion, the moving party must show that no reasonable jury could find against it.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (Rule 50 analysis mirrors summary judgment standard).  A verdict cannot stand on the "mere existence of a scintilla of evidence."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In evaluating such a motion, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1086 (9th Cir. 2014).

Punitive damages in an FHA case are available "when a defendant's conduct involves reckless or callous indifference to the federally protected rights of others."  *Sw. Fair Hous. Council v. WG Scottsdale LLC*, No. 22-16345, 2023 WL 6820681, at *2 (9th Cir. Oct. 17, 2023) (cleaned up); *accord Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).  The jury was instructed that it could award punitive damages if Adams proved by a preponderance of the evidence that the Aqua Defendants' conduct was "malicious, oppressive, or in reckless disregard of Plaintiff's rights, and that an officer, director, or managing agent of the Defendant acting in the scope of employment participated in, knew about, and/or ratified the conduct that was malicious, oppressive, and/or in reckless disregard of Plaintiff's rights."  Dkt. No. 333 at 8–9.

B.

The Aqua Defendants seek Rule 50 relief on punitive damages, arguing that the evidence established as a matter of law that:  (1) they reasonably relied on the advice of counsel in denying Adams's accommodation requests; and (2) their conduct was not malicious, oppressive, or recklessly indifferent to her rights.

1.

At the second trial, the parties agreed that the Aqua Defendants' alleged
reliance on counsel could serve as an affirmative defense to punitive damages.[4]
Pursuant to the agreement, the jury was instructed that they "must find that [the
Aqua Defendants] did not form the requisite intent for punitive damages if they
reasonably relied on the advice of their lawyer, Michael Rabkin." Dkt. No. 333 at
9. The jury was further instructed that the Aqua Defendants' reliance was
reasonable only if they proved the following elements by a preponderance of the
evidence:

(1)    before taking action;

(2)    Aqua Maintenance and/or Aqua 388 in good faith sought the
       advice of an attorney whom Aqua Maintenance and/or Aqua
       388 considered competent,

(3)    for the purpose of securing advice on the lawfulness of Aqua
       Maintenance's and/or Aqua 388's possible future conduct,

(4)    and made a full and accurate report to Aqua Maintenance's
       and/or Aqua 388's attorney of all material facts which Aqua
       Maintenance and/or Aqua 388 knew, and

(5)    acted strictly in accordance with the advice of Aqua
       Maintenance's and/or Aqua 388's attorney who had been given
       a full report.

*Id.* at 9–10.

The Aqua Defendants maintain that the only reasonable conclusion the jury
could have reached was that they reasonably relied on the advice of counsel. They
cite evidence that the Aqua 388 board referred the accommodation request to
Rabkin after Adams presented the request at the May 2017 board meeting. Dkt.
No. 366 at 179. Days later, Rabkin sent a letter to Adams denying the request. Tr.

---

[4] In reaching this agreement, the Aqua Defendants knowingly and expressly
assumed a burden that they otherwise would not have had to carry, because a
plaintiff must prove the requisite mental state to obtain punitive damages. *See
Booke v. Cnty. of Fresno*, 98 F. Supp. 3d 1103, 1131 (E.D. Cal. 2015) (noting that
the plaintiff must prove "an evil motive or intent" or "reckless or callous
indifference" for punitive damages).

Ex. 216.  The Aqua Defendants assert that they denied the request based on this legal advice and provided the accommodation only after Rabkin revised his recommendation.  Dkt. No. 368 at 362.  This is a reasonable view of the evidence. But that is not the standard of review under Rule 50.  "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (cleaned up).

Viewed in the light most favorable to Adams, the evidence could support a finding that the Aqua Defendants either did not seek Rabkin's advice in good faith or did not reasonably rely on it.  *See* Dkt. No. 333 at 9 (jury instruction requiring that the Aqua Defendants "in good faith sought the advice of an attorney . . .").  The advice itself was questionable.  In the denial letter, Rabkin stated:

> You have informed the Association that you have a permanent disability (paraplegic) that requires you to use a power wheelchair and that requires you to drive a modified accessible van that needs an 8-ft. clearance on the passenger side of the van.  You have asked that the Association accommodate your disability by permanently assigning one of its handicap parking spaces to you.  As explained below in more detail, the Association must reject your request.

Tr. Ex. 216 at 1.  Rabkin then explained that "[t]here does not appear to be any nexus between the accommodation you have requested and your disability."  *Id.* at 2.

A reasonable juror could have found that the board did not reasonably rely on this advice given what was known to the board members.  They knew that Adams was a wheelchair-bound paraplegic who had a wheelchair-accessible van that required sufficient clearance to park; and they knew that her assigned parking space did not provide the necessary clearance.  Craig Naylor, an Aqua Maintenance board member, testified:

> Q.    Well, you understand [Adams] has a ramp that comes out of her van, correct?
>
> A.    Totally understand that.
>
> Q.    And if she can't find a parking space where there is room enough for the ramp to extend, she can't get out of her van, right?

12

A.    I do understand that.

Q.    Okay.  And if she can't find a parking space where she can get out of her van, she can't go up to her condo, correct?

A.    I do understand that.

Dkt. No. 368 at 326–27.

Indeed, the nexus between the request and the disability was not difficult to understand.  Consequently, the board members could be expected to question Rabkin's contrary conclusion.  At least one board member not only questioned the conclusion but disagreed with it.  Dkt. No. 370 at 617–18.  Joan Stiehl, an Aqua 388 board member, testified that she "believed that there [was] a connection, a relationship between the parking accommodation that Dr. Adams was requesting and her disability."  *Id.*  Despite her disagreement, Stiehl did not contact Rabkin to discuss it with him, even though she had his phone number.  *Id.*

The jury was also presented with evidence that the Aqua Defendants' failure to question Rabkin's conclusion, even in the face of doubt, may have been purposeful.  When Adams requested an accommodation at the May 17 board meeting, Stiehl responded with hostility, stating that it was "all [Adams's] fault for buying a home [without] accessible parking," and that if Adams "[didn't] like it, [she] should sell and go."  Dkt. No. 368 at 480.  At the time of her comments, Stiehl understood that the law required reasonable accommodations for individuals with disabilities.  Dkt. No. 370 at 609–10.  And the Aqua Maintenance board member who testified at trial, Naylor, was opposed to accommodating Adams's request.  Dkt. No. 368 at 324 ("I believe offering anyone an exclusive usage of an ADA space is a wrong approach, and it will open us up to additional legal quagmires.").  In addition, a June 2018 email exchange between Rabkin and Harrington could be interpreted to suggest that Aqua's counsel was not acting in good faith.  Tr. Ex. 279.  By that time, they both knew that Adams had been requesting an accessible parking space for more than a year.  Yet Rabkin recommended that Harrington respond to Adams by stating that he "[didn't] know exactly what accommodation [she] want[ed], or on what basis the board should consider it."  *Id.* at 1.

There was also evidence that the boards did not actually rely—much less reasonably rely—on the advice of counsel.  While Rabkin testified that the board members reviewed and approved his denial letter before he sent it to Adams, Dkt. No. 368 at 418, Harrington and Stiehl testified that the board had not done so.  Dkt.

No. 366 at 188–89 (admission by Harrington that "[Rabkin] sent the letter to Dr. Adams without any of the board members seeing the letter"); Dkt. No. 370 at 616–17 (admission by Stiehl that she "didn't see a copy of Mr. Rabkin's letter until after he sent it to Dr. Adams"). Naylor also admitted that "the Aqua Maintenance board had [not] approved Mr. Rabkin sending [the] letter to Dr. Adams" beforehand but speculated that the letter "may very well have been ratified" by the board subsequently. Dkt. No. 368 at 310–11.

In sum, when viewed in the light most favorable to the prevailing party, a reasonable jury could have concluded that the Aqua Defendants did not meet their burden of proving that they actually and reasonably relied on Rabkin's advice in denying the requested accommodation. Adams presented evidence that board members were resistant, if not hostile, to her request and that the denial was a foregone conclusion, as demonstrated by the baseless rationale for the denial and the boards' failure to review or approve it before it was sent to Adams.

2.

The Aqua Defendants also claim that there was insufficient evidence that their actions were malicious, oppressive, or in reckless disregard of Adams's rights. They argue that the trial evidence showed that they denied the accommodation request because they believed they were legally required to treat all residents with handicap placards equally and that they were carrying out that belief by administering a facially neutral first-come, first-served policy for accessible spaces.

The evidence supports the jury's finding that the Aqua Defendants acted with at least reckless disregard of Adams's rights. "Conduct is in reckless disregard of Plaintiff's rights if, under the circumstances, it reflects complete indifference to Plaintiff's safety or rights, or if the Defendant acts in the face of a perceived risk that its actions will violate Plaintiff's rights under federal law." Dkt. No. 333 at 9 (jury instructions). As discussed above, a reasonable jury could have found that the Aqua Defendants knew that Adams's request for accommodation was directly related to her disability, that the board members were aware of their legal obligation to make reasonable accommodations, and that they denied the request out of hand without reading the questionable letter written by Rabkin.

Disregarding the standard of review on a Rule 50 motion, the Aqua Defendants attempt to dismiss the adverse evidence as disputed and subject to a different interpretation. *E.g.,* Dkt. No. 374 at 9 (arguing that Stiehl was only one

member of the board who "certainly did not . . . sway the board"). Once again, the standard is not whether the jury might have reached a decision in favor of the losing party. The question is whether, viewing the evidence in the light most favorable to the nonmoving party, a reasonable jury could have rendered a verdict against that party. Adams produced more than a "scintilla of evidence" that the Aqua Defendants acted with the requisite intent to warrant an award of punitive damages. *Anderson*, 477 U.S. at 252.

Accordingly, the Aqua Defendants' Rule 50 motion is denied.[5]

V.

FSR moves for a new trial or remittitur on the compensatory damages award, while the Aqua Defendants seek a new trial or remittitur on both the compensatory and punitive damages awards. Under Rule 59, a court may grant a new trial if it determines that "the damages are excessive." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (cleaned up). If a court finds that a damages award is excessive, it may grant a new trial or offer the prevailing party a choice between accepting a remittitur (i.e., a reduced damages award) or proceeding to a new trial. *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983). A remittitur "must reflect the maximum amount sustainable by proof," *Oracle Corp.* 765 F.3d at 1094 (cleaned up), so as to "prevent[] the court's substitution of its judgment for that of the jury," *D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982). *See also Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1087 (9th Cir. 2022) ("[T]he purpose of remittitur is to maintain the jury's verdict while lopping off an excrescence.") (cleaned up).

---

[5] Aqua 388 separately argues that it cannot be liable for punitive damages because only Aqua Maintenance had authority to grant Adam's request. Dkt. No. 347 at 11 (conclusorily asserting that there is "no evidence to suggest that [it] could have done anything relating to the parking issues"). But there was substantial evidence to the contrary, including that Rabkin denied Adams's request on behalf of Aqua 388. Dkt. No. 368 at 382 (testimony from Rabkin that he sent denial letter on behalf of both Aqua defendants); Tr. Ex. 16 (denial letter from Rabkin to Adams with subject line "Re: Aqua 388 Community Association").

A.

The jury awarded Adams $7 million in compensatory damages for emotional
harm resulting from the denial of an accessible parking space for approximately
two years.  On a Rule 59 motion, a jury's damages award "must be upheld unless
the amount is grossly excessive or monstrous, clearly not supported by the
evidence, or based only on speculation or guesswork."  *Bell v. Williams*, 108 F.4th
809, 830 (9th Cir. 2024) (cleaned up).  To determine whether an award is grossly
excessive, courts look to several factors, two of which are particularly relevant—
the evidence at trial and comparable damages awards.  *Id.* at 832.

1.

The Court first considers whether the evidence at trial supports the $7
million award, giving "foremost priority" to this consideration.  *Id.*

At trial, Adams testified extensively about the harm she experienced from
the denial of her accommodation request.  For two years, Defendants denied
Adams an accessible parking space.  During that time, she often drove around for
30 minutes to an hour after work searching for a parking space.  Dkt. No. 368 at
465–66.  On some evenings, when unable to find an accessible space, she worked
and ate dinner in her van and felt "trapped" in her car—afraid to leave even to use
the restroom for fear of being towed.  *Id.* at 466; *see* Tr. Ex. 190 (handwritten note
left on Adams's car, warning that the no parking zone was "[n]ot a parking spot!!"
and that "[n]ext time, [she would] be towed.").  Adams testified that the towing of
her car would have been a "disaster," explaining that she would have had difficulty
retrieving her car and was concerned that she would miss work and lose her job.
Dkt. No. 368 at 473–74.  In addition to feeling helpless and demeaned by these
experiences, Adams suffered physical symptoms of stress, including panic attacks,
chest and abdominal pain, migraines, insomnia, and irritability.  *Id.* at 457, 461–63,
480, 483–84; Dkt. No. 370 at 510, 587.  Adams testified that she withdrew from
her friends, stopped showering and cleaning her apartment, and seriously
contemplated suicide.  Dkt. No. 370 at 510, 511–12, 517, 587–88.

Adams did not call a mental-health expert at trial and presented no evidence
that she sought or received mental-health counseling.  Instead, two of her friends
provided supporting testimony.  Karla Mendez testified that from 2017 to
approximately May 2019, Adams "went from being a . . . happy person" to
someone who appeared "defeated . . . , tired and depressed."  Dkt. No. 368 at 294,
296–97.  Zahra Baratian provided similar but more expansive testimony.  She also

acknowledged that Adams experienced stress from other sources and contemplated suicide in July 2022—more than two years after she received an accessible parking space. Dkt. No. 229 at 254; *see also id*. at 257 (acknowledging that "Adams was at the peak of her emotional distress during the summer of 2022"). Adams had told Baratian that "she felt the entire world was against her." *Id*. at 257. In addition to the parking issue, Adams explained that she felt harassed at work by both colleagues and students. *Id*. at 246, 249–51.

The evidence supports a substantial compensatory damages award for past and future emotional harm, and Defendants are wrong to suggest that Adams was required to provide documents, phone records, photographs, or similar corroboration to substantiate her claim of significant emotional and resulting physical harm. "Evidence supporting an emotional damages award may consist of nothing more than oral testimony." *Bell*, 108 F.4th at 832. But to say that the evidence supports a substantial award is not to suggest that the sky is the limit. Though emotional damages are "subjective and difficult to quantify," there "must be an upper limit to every damages award," lest compensatory damages "go beyond their compensatory function and turn punitive." *Id.* at 831 (cleaned up). Adams argues that the $7 million verdict was not excessive because the evidence supported a substantial award. But that argument would support virtually any award—applying equally to a $10 million, $20 million, or even $100 million verdict.

Deciding the upper limit of an emotional damages award is anything but a precise or mathematical exercise. Juries are empowered to make imprecise calculations about inherently unquantifiable harm with exceptionally limited and wholly vague judicial guidance. *See* Dkt. No. 333 at 7 (instructing the jury to award compensatory damages in an amount "that will reasonably and fairly compensate Plaintiff for any injury . . . caused by the Defendants"). This recognition, coupled with a fundamental respect for the role of a jury and the limited function of judicial review, requires a dose of deference and a measure of latitude when considering whether an award is "excessive." Still, Ninth Circuit law requires review for excessiveness under Rule 59(a), and a district judge is not free to throw up his hands and rubber stamp an award because the assigned task is messy. *See Bell*, 108 F.4th at 831 (concluding that there is an "upper limit" on a compensatory damages award, finding the award to be "grossly excessive," and reversing district court's order denying a new trial on damages).

In *Bell*, the plaintiff, Vincent Bell, was a pretrial detainee who had limited mobility because his right leg had been amputated above the knee. After he

17

committed three disciplinary violations, Sergeant Yvette Williams decided to move Bell to a segregation cell. When he refused to leave his cell, Williams ordered him to be forcibly extracted. *Id*. at 815. When the deputies entered his cell, Bell became fully compliant. He "was sitting calmly in his wheelchair," raised his hands above his head, and got on the ground when ordered to do so. *Id*. at 816–17. Reviewing the video recording of the incident, the Ninth Circuit described what happened next:

> The deputies handcuffed Bell's hands behind his back and helped him stand up on his one leg. He was shoeless. Sergeant Williams then instructed Bell to hop on his bare left foot to a safety cell, a distance of about 64 feet. Bell tried to comply. A deputy stood on either side of him as he hopped, holding him up by his arms. About two-thirds of the way there, Bell fell to the ground. He said that his leg was tired. Sergeant Williams instructed Bell to stand up. Bell repeated that his leg was tired and he remained on the ground. Sergeant Williams then told the deputies to "assist him to his foot." The deputies reached down, picked up Bell by his two arms and one leg, and carried him the rest of the way. Bell's arms were handcuffed behind his back, so carrying him that way put significant pressure on his shoulders. Bell testified that he heard his shoulder pop in the process. Once in the safety cell, the deputies removed all of Bell's clothing and left him naked in the cell. Bell did not resist the officers stripping his clothes.

*Id*. at 817.

Bell testified that the incident harmed him both physically and emotionally. "[W]hen he was hopping, he experienced pain in his hips, knee, ankle, and back that rated 9.5 on a 10-point scale," "he heard his shoulder pop when the deputies lifted him by his handcuffed limbs to carry him," and "the handcuffs cut into his wrists during the transport"—leaving him with "bruises on his wrists, a swollen knee, and a swollen shoulder." *Id*. at 821. The incident also "exacerbated his preexisting injuries, including those due to multiple gunshot wounds." *Id*. at 833. The parties agreed that "the bulk of Bell's damages award must have been based on emotional distress and pain and suffering." *Id*.

After finding liability, the jury awarded Bell $504,000 in compensatory damages for his physical and emotional harm, and the district court declined to disturb the award. The Ninth Circuit reversed. After reviewing the evidence in the case and awards in comparable cases, the Ninth Circuit concluded that the

$504,000 award was grossly excessive, stating:  "[W]e find it difficult to conceive that Bell's emotional distress and pain and suffering could be valued reasonably anywhere above $150,000."  *Id.* at 835.  The panel remanded the case and directed the district court to grant a new trial on damages unless Bell accepted a remittitur "in an amount to be determined by the district court consistent with this opinion."  *Id.*

In reaching this conclusion, the Ninth Circuit searched in vain for cases upholding a comparable damages award.  The "closest" was *Cervantes v. County of Los Angeles*, No. 12-CV-9889, 2015 WL 5163031 (C.D. Cal. Sept. 3, 2015), in which a jury awarded $900,000 for injuries Cervantes sustained when two deputy sheriffs punched, tackled, and transported him to jail.  He suffered a swollen eye, contusions, and abrasions, and testified that he continued to have headaches, eye pain, and floaters in his vision ever since.  He also testified that he suffered significant and lasting emotional harm, including insomnia caused by recurring nightmares of being killed by police and anxiety about going out in public due to fear of further victimization.  The district court remitted the award to $500,000 and gave Cervantes the option of a new trial instead.  *Bell*, 108 F.4th at 834–35 (discussing *Cervantes*).  The *Bell* panel observed that the award in *Cervantes* was distinguishable because Cervantes, unlike Bell, introduced evidence that he likely would suffer future pain and emotional distress.  *Id.*

2.

In deciding whether the $7 million award in this case was grossly excessive, the Court next considers—with caution—damages awarded in other cases.  *Id.* at 832.  The Court addresses: (a) the principal cases relied upon by the parties, (b) workplace discrimination cases involving substantial emotional harm, and (c) a lawsuit filed by Adams alleging disability discrimination, harassment, retaliation, and failure to accommodate.

a.

Adams points to several false arrest cases resulting in large awards, arguing that they provide helpful comparisons because she felt trapped in her car and condominium because of the refusal to give her an accessible parking space.[6]  Dkt.

---

[6] Adams also cites to *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001), in which the Ninth Circuit concluded that the district court had improperly granted remittitur of a $3,040,439 verdict in an FHA case.

No. 365 at 10–11 (citing *Stoll v. Cnty. of Kern*, 41 Trials Digest 12th 4 (2009), *Dirks v. Martinez*, 21 Trials Digest 15th 4 (2012), and *Harper v. City of Los Angeles*, 533 F.3d 1010, 1029 (9th Cir. 2008)).  None of these cases is comparable.

In *Stoll*, the plaintiff was arrested, prosecuted, convicted, and sentenced to 40 years in prison for child sex abuse based on improper interview techniques used by the defendants.  The plaintiff's conviction was eventually set aside due to those techniques, but not until he had served 20 years.  He sued for numerous constitutional violations, including false arrest and false imprisonment.  *Stoll v. Cnty. of Kern*, Case No. 1:05-CV-01059 (E.D. Cal.), Dkt. No. 95.  The parties settled for $5.5 million—$1.5 million less than the verdict rendered in this case. *Stoll v. Cnty. of Kern*, 41 Trials Digest 12th 4 (2009).

In *Dirks*, the plaintiff brought a lawsuit under 42 U.S.C. § 1983, claiming that he was beaten by two police officers and then falsely charged and criminally prosecuted for assaulting and obstructing those officers.  The jury awarded $5,000,000 in compensatory damages against the two officer defendants, which was later reduced to $3,900,000, including substantial attorneys' fees and costs, pursuant to the parties' settlement.  *Dirks v. Martinez*, Case No. 2:08-CV-05214-ODW (C.D. Cal.), Dkt. Nos. 206, 207.  Dirks claimed that he was pepper sprayed, slammed to the ground, badly beaten, and sustained a fractured eye socket.  Case No. 2:08-CV-05214, Dkt. No. 183-1 at 43–44, 117 of 98.  He was then taken to jail, where he spent five days in a filthy and threatening environment.  *Id*. at 56 of 98.  He was later prosecuted for crimes that exposed him to a potential sentence of 10 years in custody.  *Id*. at 43 of 98.  At trial, the officers gave false testimony that Dirks feared could have resulted in his conviction.  *Id*.  For 253 days, he faced the prospect of being found guilty of crimes he did not commit and being sentenced to a lengthy prison term.  *Id*. at 64 of 198.  He also experienced financial devastation, as his school bus driver's certificate was revoked as a result of the false allegations against him.  *Id*. at 59 of 98.  Dirks testified about serious past, present, and future physical pain, including stabbing pain in his eye; he also testified about serious past, present, and future emotional harm, including depression, social withdrawal, and a sense of insecurity and worthlessness.  *Id*. at 58, 64–65 of 98.

---

That case, which involved an award for lost profits and other economic harm supported by expert calculations, is inapposite.  *Id.* at 819–24.

In *Harper*, three police officers were falsely implicated in one of the most
notorious police corruption scandals in the history of the Los Angeles Police
Department—the so-called "Rampart Scandal." 533 F.3d at 1014. The scandal
"generated intense media scrutiny," including a front-page article in the *Los
Angeles Times* announcing that the three officers would be arrested "like any other
criminal." *Id*. at 1015, 1020. Aside from their arrest, the officers were subjected
to a highly public trial on serious charges and threats on their lives. After their
acquittal, they sued the City of Los Angeles and others for violations of their civil
rights, and the jury awarded each of them $5,000,001. The officers testified about
the devastating effect of the extraordinary media attention given to their arrests and
prosecutions, causing significant physical and emotional harm. *Id*. at 1029.
Officer Edward Ortiz experienced heartburn, back and neck pain, anxiety attacks;
he became suicidal; and "his family broke apart when his wife left him because of
the negative publicity, and his teenage stepdaughter ran away, attempted suicide
and was placed in a psychiatric ward." *Id*. Officer Brian Liddy "gained 100
pounds, was hospitalized for chest pains, and developed high blood pressure and
anxiety," and he "lost his career, filed for bankruptcy, and the negative publicity
had significant adverse effects on his young children." *Id*. Officer Paul Harper,
who was informed that he was placed on a hit list by a gang member, developed
high blood pressure and intestinal problems, became paranoid, began drinking
heavily, and was reassigned to a desk job. *Id*.

Adams claims that *Stoll*, *Dirks*, and *Harper* are analogous because she felt
trapped by her circumstances. While it is not difficult to understand that she felt
trapped at times, it is difficult to equate being denied an accessible parking space
for two years with the 20-year loss of liberty in *Stoll*; or with the vicious beating,
the fractured eye socket, the false arrest, the detention, and prosecution in *Dirks*; or
with the false arrest and prosecution at the center of a nationally prominent police
corruption scandal in *Harper*. Adams's harm, while undoubtedly significant, did
not match the severity of the arrest, prosecution, and loss of liberty involved in
those cases—each of which resulted in comparatively smaller awards. And even in
cases involving devastating harm caused by false arrest and incarceration, courts
have reduced awards that were less than the one Adams obtained. *See, e.g.*, *J.N. v.
Hendrickson*, No. 2:14-CV-02428-DDP, 2017 WL 2539390, at *6–8 (C.D. Cal.
June 12, 2017) (ordering remittitur from $5 million to $3 million for emotional
harm caused by false arrest for child abuse by a plaintiff who "spen[t] nearly seven
and half months in custody, fac[ed] violence from fellow inmates and social stigma
from others, and fear[ed] a potential lengthy prison sentence on serious charges");
*Smith v. City of Oakland*, 538 F. Supp. 2d 1217, 1240–43 (N.D. Cal. 2008), *aff'd*,
379 F. App'x 647 (9th Cir. 2010) (ordering remittitur from $5 million to $3 million

21

for emotional harm caused when police officers planted evidence resulting in plaintiff's arrest, incarceration for four and half months, prosecution, and "shattered" his life with the loss of "his job, his family, his furniture, and his home"); *cf. Myles v. Cnty. of San Diego by and through San Diego Sheriff's Dep't*, No. 23-3198, 2025 WL 1367186, at *3 (9th Cir. May 12, 2025) (reversing denial of remittitur of $5 million award where plaintiff experienced emotional harm from police dog encounter and handcuffing but was "well within the normal range for anxiety depression, irritability, and stress" and there were no findings of "significant emotional symptoms and problems") (cleaned up).

For its part, FSR argues that it has identified several comparator cases demonstrating that a remittitur is warranted here. These cases appear to be more relevant, as they involve claims based on the failure to accommodate a plaintiff's disability—several of which concern the denial of handicapped parking or other access-related accommodations. *See Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 893 (7th Cir. 1996) (awarding $2,500 against apartment complex for violating FHA by failing to provide parking space close to petitioner's apartment building); *Marcano-Rivera v. Pueblo Int'l, Inc.*, 232 F.3d 245, 250 (1st Cir. 2000) (awarding $225,000 against former employer for denying plaintiff the use of a handicapped parking space and forcing her to walk on amputated limbs to reach her work area); *Burnett v. Ocean Props., Ltd.*, No. 2:16-CV-00359, 2019 WL 6192378 (D. Me. Nov. 1, 2018) (awarding $150,000 against former employer for impeding wheelchair access to handicapped parking and other workplace areas); *Montano v. Bonnie Brae Convalescent Hosp., Inc.*, 79 F. Supp. 3d 1120, 1133–34 (C.D. Cal. 2015) (awarding $65,000 against a skilled nursing home facility for FHA and other statutory violations, over a two-year period, in denying plaintiff reasonable access to his room and bathroom); *Mascarella v. CPlace Univ. SNF, LLC*, No. 3:13-CV-00642, 2015 WL 6689212 (M.D. La. July 21, 2015) (awarding $200,000 for failing to reasonably accommodate requests for handicapped parking space and bathroom); *Dep't of Fair Emp. and Hous. v. The 2001 St. P'ship*, 49 Trials Digest 9th 1 (Cal. Super. Ct. Nov. 1, 2005) (awarding $219,000 in past noneconomic damages for, among other things, denying plaintiff's request for a parking space to accommodate her limited mobility).[7] While the damages in these

---

[7] The Aqua Defendants also rely on *C.R. v. PLB Mgmt. LLC*, a parking accommodation case in which the district court granted judgment as a matter of law and conditionally granted a new trial on the issue of emotional damages, finding "no evidence" to support the $250,000 award. No. 2:21-CV-03275-ODW, 2023 WL 3868353, at *6 (C.D. Cal. June 7, 2023). After the parties submitted their briefing, the Ninth Circuit reversed the district court's Rule 50 ruling, finding

more comparable cases represent only a small fraction of the award rendered in favor of Adams, it is unclear whether the plaintiffs in those cases experienced the same degree of emotional harm. The cited cases and trial digests do not describe in sufficient detail the evidence of emotional harm resulting from the misconduct. Thus, the Court considers these cases with due caution, noting only that the amount awarded to Adams stands out as an outlier in the context of this type of claim.

b.

The Court has also reviewed employment discrimination cases involving conduct that caused severe emotional harm. Even in egregious cases, the awards for significant emotional harm typically fall well below the $7 million awarded here. *See, e.g.*, *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 504, 513 (9th Cir. 2000) (affirming $1 million award in gender-discrimination case in which the plaintiff was repeatedly subjected to sexist, derisive, demeaning, and retaliatory acts causing her to suffer from substantial anxiety, a sense of being "trapped," and stress-related physical symptoms); *Anderson v. Am. Airlines, Inc.*, No. 05-CV-04292, 2008 WL 4816620, at *6 (N.D. Cal. Nov. 5, 2008) (denying challenge to $1 million award for intentional discrimination against the plaintiff based on her perceived mental disability that "took a great emotional toll on her"), *aff'd*, 352 F. App'x 182, 183 (9th Cir. 2009); *Erhart v. BofI Fed. Bank*, No. 23-3065, 2025 WL 417000, at *2 (9th Cir. Feb. 6, 2025) (affirming $1 million award where plaintiff experienced physical symptoms and changed personality due to employer's retaliation); *Diaz v. Tesla, Inc.*, 598 F. Supp. 3d 809 (N.D. Cal. 2022) (remitting award to $1.5 million in case involving pervasive racial discrimination).

*Diaz* merits further discussion. In that case, the plaintiff was the victim of a pattern and practice of racial discrimination that "permeated" the workplace. *Diaz*, 598 F. Supp. 3d at 837. He was repeatedly confronted with hateful words, including being called a "porch monkey" and being told to "go back to Africa," and he "encountered slurs and swastikas on bathroom stalls . . . and a racist picaninny drawing near his workstation." *Id.* at 835. The jury found that "the emotional effects on [the plaintiff] were profound," as they heard evidence that "[a]fter weeks and months of racist harassment, he became withdrawn, sad, and

---

that emotional distress damages "do not require quantifying evidence," but affirmed the conditional grant of a new trial based on plaintiff's counsel's improper closing argument. *C.R. v. PLB Mgmt., LLC*, No. 23-55596, 2024 WL 5482654, at *2 (9th Cir. Mar. 24, 2025). The panel did not address whether the emotional damages award was excessive—the issue presented here.

fundamentally different." *Id*. "He stopped eating, stopped sleeping, stopped having intimate relations with his wife, and withdrew from involvement in his child's life." *Id*.; *see also id*. at 838 (noting that the plaintiff "entered essentially a depressive episode in which his entire personality changed and in which he was reminded of past racist horrors against his parents"). After the jury awarded the plaintiff $6.9 million for his past and future emotional harm, the district court acknowledged that the plaintiff was "severely harmed" but ordered a remittitur of $1.5 million, finding that the jury's award was "far out of proportion to the evidence" and comparable cases. *Id.* at 840.

c.

In the end, the most comparable case is one involving Adams—*Adams v. Coast Community College District*. On July 6, 2018, Adams filed a state lawsuit against her former employer, Coast Community College (Coast), alleging that she was the victim of workplace discrimination, harassment, and retaliation and that she suffered serious emotional distress as a result. Dkt. No. 383-1 (first amended complaint).

Adams started working as an adjunct instructor for Coast in June 2015. *Id.* at 3 ¶ 9. Later that summer, she experienced disability-related harassment by one of the deans, Michelle Priest. *Id*. at 4 ¶ 11 (alleging that Dean Priest "chastise[d] her in a condescending way" and "harassed [her] based upon her disability"). The harassment persisted into the fall of 2015, when she was assigned to teach a lab course in a room that was not wheelchair accessible. *Id*. at 4–6 ¶¶ 11-18. She initially received permission to teach the course in another available room that was wheelchair accessible but was advised she had to obtain approval from Dean Priest to use it throughout the semester. Dean Priest denied her accommodation requests on September 14 and 15, 2015. *Id*. at 4 ¶¶ 13–14. When Adams subsequently met with Dean Priest (and another college dean), Dean Priest launched into a "lengthy condescending tirade," stating that "it was a mistake that [Adams] was hired in the first place due to her physical limitation" and "blaming [the department chairs] for hiring Ms. Adams knowing her physical limitations." *Id*. at 4–5 ¶ 14. "Dean Priest even suggested that Ms. Adams should start looking for jobs closer to where she lived." *Id*. Adams reported the misconduct and filed a complaint with the human resources department. On September 23, 2015, Adams received the requested accommodation and was able to use the accessible classroom. *Id*. at 6 ¶ 20.

The discrimination and harassment did not stop in 2015. During the investigation of her complaint, Dean Priest retaliated by "[taking] away Ms.

Adams' online teaching assignment for 2016." *Id.* at 7 ¶ 22. Adams also learned in 2016 that the internal investigation found that "Dean Priest's statements were unlawful, unprofessional, demeaning, and would cause a reasonable person in [her] situation to feel uncomfortable in the work environment," but that Dean Priest had not engaged in discrimination. *Id.* at 7–8 ¶ 23. Adams appealed the decision and alleged that the investigation had been conducted "incompetently" and in bad faith. *Id.* at 8 ¶ 24. A few months later, on March 24, 2016, Coast "again took away one of Ms. Adams's two summer courses that she was offered and scheduled to teach during the summer of 2016." *Id.* at 8 ¶ 25. Coast informed Adams in August 2016 that she would not be offered any classes for the fall semester, and she did not receive a new teaching assignment from the time of the accommodation request in 2016 through the filing of the complaint in 2018. *Id.* at 8 ¶ 26.

In her state lawsuit, Adams asserted six disability-related claims, including claims for harassment, discrimination, retaliation, and failure to accommodate. She listed 14 separate acts of harassment and alleged that "the acts taken toward [her] were carried out in a deliberate, cold, callous and intentional manner in order to injure and damage [her]." *Id.* at 9–10 ¶ 29, 11 ¶ 35. She claimed that these acts caused her to suffer—and that she "continues to suffer"—"extreme emotional pain," including embarrassment, humiliation, and mental anguish. *Id.* at 10 ¶ 33. Coast ultimately settled the lawsuit, paying Adams $140,000.

In closing argument in this case, the parties relied on the $140,000 settlement as a comparative benchmark. FSR argued that $140,000 was an appropriate award in this case given the similarity of the harm claimed in her employment discrimination suit. Dkt. No. 370 at 729–30. In rebuttal, Adams argued that $140,000 represented compensation for one week of emotional harm— the amount of time Adams was denied an accessible classroom—and asked the jury to extrapolate from one week to years' worth of harm caused by Defendants. *Id.* at 734.

To the extent that Defendants rely on the $140,000 settlement in the *Coast* case to establish the upper limit on any award, the argument is unpersuasive given Adams's testimony that she suffered more severe harm in this case. *Id.* at 536. But the argument rests more firmly on the trial evidence than the one advanced by Adams's counsel. Adams testified on cross-examination that she continued to suffer emotional harm from the employment discrimination by Coast and Priest:

Q. Okay. Now, when you filed your lawsuit against Coast . . . , you
   claim to have suffered embarrassment, humiliation, mental anguish,

25

severe shock to your nervous system, serious injuries to your mental health, and extreme emotional distress, correct?

A.  Correct.  Until this day, yes.

Q.  Okay.  And as you just said, to this day.  So you suffered that severe and extreme emotional distress caused by Coast in 2015 and every year thereafter through the present, correct?

A.  That is something that will never leave my mind.

*Id.* at 535–36; *see also id*. at 538 (deposition testimony admitting that "the settlement of $140,000 that [she] received in 2020 was to compensate [her] for the emotional distress that was ongoing since at least 2015").

Despite this testimony, Adams's counsel argued at the end of his rebuttal argument:  "If one week is worth $140,000, what is two years' worth in her own home?  What are seven years' worth in her own home?  What is the future worth?" *Id.* at 734.  This argument is misleading.  Even if the discrimination occurred over the course of one week—and Adams complained about more than one week of misconduct—Adams unequivocally testified that she continued to suffer serious emotional harm *almost 10 years after the discrimination*.  Yet her counsel equated the period of wrongdoing with the duration of the resulting harm.  Building on that false equivalency, counsel suggested that the jury should consider the value of the harm Adams suffered in her home over the course of two years (up to the time when she received the accessible parking space)—which, at $140,000 per week, totals $14,560,000.  He then suggested that the jury consider the harm suffered over the course of seven years (up to the time of trial)—which, at $140,000 per week, totals $50,960,000.[8]  In this context, his earlier request that the jury award $7,500,000 in compensatory damages may have seemed reasonable.

3.

The Court finds that the compensatory damages award was grossly excessive.[9]  While a jury reasonably could conclude that Adams suffered serious emotional harm, the evidence does not support a $7 million award—almost the

---

[8] Counsel did not calculate the math for the jury.

[9] In light of this conclusion, the Court does not address the other challenges to the compensatory damages verdict.

entire amount requested by her counsel based on a misleading argument.  That award far exceeds awards in numerous cases where plaintiffs experienced substantial emotional harm—whether from wrongful arrest, imprisonment, and prosecution; from the failure to provide accessible accommodations; or from severe workplace discrimination.  While not perfectly analogous, these cases underscore that the $7 million award is disproportionate when measured against awards in cases involving severe emotional harm.

To the extent that any case provides an appropriate benchmark, it is the one the parties used at trial—the *Coast* case brought by Adams, asserting substantial emotional distress caused by disability discrimination and lack of accommodation. The harm caused was so severe that it has endured for more than a decade and "will never leave [her] mind." *Id.* at 535–36.  Despite the similarities, Adams provided testimony in this case that could support an award higher than the $140,000 settlement in *Coast*.  Though Adams could not separate or "divide the traumas" she experienced at Coast and at Aqua, she explained that they were not the same. *Id.* at 537.  Adams testified that there was "no comparison" between the two because "Aqua is [her] home." *Id.* at 536.  For two years, she was unable to return home in peace, driving for hours at times to find accessible parking, and when none was available, parking in a no-parking zone and sleeping in her car. Dkt. No. 368 at 457, 466.  On days when she believed she would be unable to find parking, she cancelled her classes and remained inside her condominium. *Id.* at 474–75.  A jury could reasonably conclude that the harm Adams suffered here—disrupting her daily life over a prolonged period—was substantially more severe than in the *Coast* case.

But how much more harm would the record support?  Certainly not 50 times more—the amount awarded by the jury.  Based on the evidence and the analysis above, the Court concludes that the maximum award sustainable by proof is $2,000,000—which is almost 15 times the settlement amount in the *Coast* case. This amount exceeds what the Court would expect a jury to award in a properly tried case.  But the Court cannot say that it exceeds what a reasonable jury could award based on the evidence.

## B.

The Aqua Defendants also move for a new trial or remittitur on punitive damages, arguing that the $400,000 punitive damages award—$100,000 against Aqua 388 and $330,000 against Aqua Maintenance—was against the clear weight of the evidence.  *See Bell*, 108 F.4th at 819 ("A new trial should be granted only if

the jury's verdict is against the clear weight of the evidence.") (cleaned up).  They raise two arguments in support.

First, the Aqua Defendants contend that the same evidence supporting their Rule 50 motion warrants relief under Rule 59.  As previously discussed, Adams presented substantial evidence that the Aqua Defendants acted with the requisite intent for punitive damages.  Considering that evidence under Rule 59, the Court cannot conclude that the $400,000 award was against the clear weight of the evidence.  *See Silver Sage Partners*, 251 F.3d at 819 (concluding that "a district court may not grant a new trial simply because it would have arrived at a different verdict").

Second, the Aqua Defendants argue that Adams's financial expert, Drew Fountaine, failed to present evidence supporting the jury's punitive damages award.  Fountaine, an accountant, testified that his review of the Aqua Defendants' financial statements demonstrated that Aqua Maintenance's net worth was $2.62 million and Aqua 388's net worth was $5.75 million.  Tr. Ex. 181 at 2; Tr. Ex. 182 at 2.  Defendants argue, however, that Fountaine admitted on cross examination that most of those funds were reserved for specific purposes, including repairs and replacements.  Dkt. No. 346 at 19; *see, e.g.*, Tr. Ex. 181 (including "operating account funds," "reserve account funds" and "reconstruction funds" among assets); *id.* at 15 ("The Association's governing documents require funds to be accumulated for future major repairs and replacements of common property components.").

Fountaine testified on redirect, however, that the restricted funds could be used for other purposes, including payment of a judgment.  Plaintiff's counsel pointed Fountaine to another section of the financial documents, which provides that "all accumulated funds [for future major repairs and replacements of common property components] . . . are *generally* not available for normal operative purposes."  Tr. Ex. 182 at 15 (emphasis added).  Fountaine testified that such language did not read as an absolute restriction on use of the funds.  Fountaine also explained that the financial documents did not restrict the Aqua Defendants' ability to borrow against their own funds.  The Aqua Defendants presented no evidence to the contrary.  Nor do they provide any authority to support their argument that Fountaine's testimony warrants a new trial or remittitur under applicable law.  *See Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 806 (9th Cir. 2018) ("Under federal law, ability to pay is of some importance in assessing the propriety of a punitive damages award[,] but it is not dispositive.");  *cf. Morgan v. Woessner*, 997

F.2d 1244, 1259 (9th Cir. 1993) (noting that California law requires consideration
of financial worth in determining appropriateness of punitive damages award).

Because the Aqua Defendants have not shown on this record that the
$400,000 award was against the clear weight of the evidence, the Court denies the
Rule 59 motion as to punitive damages.

## C.

For the reasons stated above, Defendants' motion for remittitur is granted
only as to compensatory damages.

If Adams declines to accept the remittitur—for a total recovery of $2 million
in compensatory damages and $400,000 in punitive damages—a new trial will be
granted as to both compensatory damages (against the Aqua Defendants and FSR)
and punitive damages (against the Aqua Defendants). *See* Fed. R. Civ. P. 59(a)
("The court may . . . grant a new trial on all or some of the issues."). The Court
declines to award a partial new trial on compensatory damages only, as it does not
"clearly appear[]" that compensatory damages are "so distinct and separable" from
punitive damages that a trial on compensatory damages alone "may be had without
injustice." *Gasoline Prod. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931);
*see Williams v. Marinelli*, No. 3:13-CV-1154, 2017 WL 11473740, at *26 n. 22
(D. Conn. Feb. 8, 2017) (remitting punitive damages only but conditionally
ordering new trial on compensatory and punitive damages); *Burke v. Deere & Co.*,
6 F.3d 497, 513 (8th Cir. 1993) (finding retrial on punitive damages only "would
be improper because the issues underlying compensatory and punitive awards are
inextricably intertwined"); *cf. White v. Ford Motor Co.*, 500 F.3d 963, 974 (9th
Cir. 2007) (finding jury "empaneled to award punitive damages . . . could not have
come to a reasoned conclusion as to the amount of additional damages necessary to
deter [defendant]" without knowing the amount of compensatory damages awarded
by first jury).

## VI.

FSR's Rule 59(e) motion, Harrington's motion for fees, and the Aqua
Defendants' Rule 50 motion and Rule 59(a) motion for a remittitur of punitive
damages are denied. The Court grants the Aqua Defendants' and FSR's motion for

a remittitur of the compensatory damages award to $2 million.[10]  By September 5, 2025, Adams shall file a notice stating whether she accepts or rejects the remittitur. Should Adams accept the remittitur, she shall also file on that date a proposed amended judgment.  Should she reject the remittitur, a new trial will be granted on compensatory damages against the Aqua Defendants and FSR and on punitive damages against the Aqua Defendants.


Date: August 6, 2025                                   _____

                                                      Stanley Blumenfeld, Jr.
                                                      United States District Judge

---

[10] The Court defers consideration of Adams's motions for attorney's fees and interest until after her election on the remittitur.  Dkt. Nos. 350, 351.